**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Paul MANFREDI, George Weggers, and Emory Butner, Defendants-Appellants.**

**Nos. 81–1359, 81–1360 and 81–1681.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 1982.

Decided Dec. 21, 1983.

As Amended on Denial of Rehearing
Jan. 26, 1984.

David V. Marshall, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Howard Ratner, David L. Shorett, Harvey Chamberlain, Laurence B. Finegold, Seattle, Wash., for defendants-appellants.

Before BROWNING, Chief Judge, TUTTLE,* and REINHARDT, Circuit Judges.

BROWNING, Chief Judge:

Butner, Manfredi and Weggers appeal from convictions for conspiracy to distribute cocaine, distribution of cocaine, and possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1976) and 18 U.S.C. § 2 (1976). We affirm.

Agents of the Drug Enforcement Administration (DEA), cooperating with officers of the Royal Canadian Mounted Police (RCMP), investigated cocaine trafficking in the Bellingham, Washington area. James Ballendine, an RCMP undercover agent, assumed the identity of a "middle level drug trafficker from Vancouver," and in this capacity became acquainted with Jeffrey Randall, who occasionally sold him small amounts of cocaine. Ballendine expressed interest in purchasing as much as five pounds. Thereafter, Randall met with Ballendine in Bellingham to confirm that a "source in Florida" could supply five pounds of cocaine.

One week later, Ballendine met Randall by arrangement at the Seattle-Tacoma Airport and accompanied him to the lounge of the nearby Seattle Holiday Inn. Sergeant Lee Joubert of the RCMP, also acting undercover, joined them and the three discussed the cocaine transaction, agreeing upon the sale of about five pounds for $160,000. Ballendine said he wanted to purchase all five pounds at once. Randall said he was not sure the transaction could

be conducted in this manner but would check with his associates. He left the lounge, entered the hotel elevator, and rode to the fourth floor. Surveillance officers saw him enter Room 410.

A surveillance officer contacted the hotel management and learned that Room 410 and the adjoining room, 412, were registered to appellant Emory Butner and occupied by Butner and two others. One of the DEA agents, Special Agent Smith, knew Butner had been involved in drug trafficking between Florida and Washington State from July 1979 through January 1980, and had a reputation for violence. In addition, Agent Smith had been told by John Bora, Butner's brother-in-law, that Weggers was an associate of Butner and a member of the "Bandito" motorcycle gang; and that Butner had used Weggers to threaten Bora over a drug debt. Smith notified the other agents about Butner and Weggers and their propensity for violence.

After visiting Room 410, Randall returned to Ballendine and Joubert in the hotel lounge and told the agents "his people from Florida" were unwilling to complete the transaction in one step. Manfredi entered the lounge, and Ballendine and Joubert showed him a satchel containing $160,000. Manfredi told the agents he had no authority to decide whether all the cocaine could be transferred at once and said he would have to consult "his people" from Florida. He left the lounge, and agents saw him enter Room 410.

Manfredi returned five minutes later. He told Ballendine and Joubert they could examine half of the shipment, approximately two and a-half pounds, in Randall's tenth floor room, and deliver the cash ($80,000) for that portion. Randall and Ballendine left the lounge to go to the tenth floor room, Manfredi and Joubert staying behind. The elevator stopped on the fourth floor and Weggers entered. Randall introduced Ballendine and the three proceeded to

---

* Honorable Elbert P. Tuttle, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

Room 1003. After they entered the room, Weggers produced six packages from under his sweater and offered them for inspection. An agent observed Butner in the corridor listening at the door of the room. Shortly after Weggers produced the packages, Ballendine activated a silent alarm. Approximately two minutes later DEA agents simultaneously arrested Manfredi in the lounge and Weggers and Randall in Room 1003, and seized the two and a-half pounds of cocaine. By then, Butner had returned to his fourth floor rooms.

After his arrest Weggers admitted he had a gun in the hotel, but said it was not in Room 1003. DEA agents on the fourth floor were advised of what had occurred.

Shortly thereafter, an agent equipped with a bulletproof vest inserted a passkey in the lock to Room 410, knocked on the door, shouted "Federal agents, open the door," waited a few seconds, and entered. The room was empty. The agent then knocked on the connecting door to Room 412, announced "Federal agents, open up," waited a few seconds, kicked in the door and entered. Butner and Sandra Moore were arrested inside. The agents subsequently obtained a search warrant for rooms 1003, 410 and 412, as well as for Moore's purse, and searched them, discovering cocaine in rooms 1003 and 410 and in Moore's purse.

## I. Contentions of Emory Butner

Butner contends that his arrest was unlawful because the circumstances were not sufficiently exigent to excuse the agents' warrantless entry into rooms 410 and 412. He also challenges the district court's finding that these same circumstances justified the agents' failure to comply with the federal "knock and announce" statute. 18 U.S.C. § 3109 (1976).

### A. The Validity of Butner's Arrest

Numerous cases have sustained warrantless entries to effect arrests where probable cause existed and the circumstances justified a reasonable belief that evidence would be destroyed or risk of harm to the police or

others would be enhanced if entry were delayed until a warrant could be obtained. See, e.g., United States v. Kunkler, 679 F.2d 187, 191–92 (9th Cir.1982), and cases cited therein.

■ We agree with appellant that in determining whether exigent circumstances justify an exception to the general rule requiring a warrant, the burden rests on the government to show that the warrantless entry was "imperative." McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 196, 93 L.Ed. 153 (1948). We also agree with appellant that this standard is not satisfied unless the government demonstrates that a warrant could not have been obtained in time even by telephone under the procedure authorized by Fed.R.Crim.P. 41(c)(2). United States v. Cuaron, 700 F.2d 582, 589 (10th Cir.1983); United States v. McEachin, 670 F.2d 1139, 1147 (D.C.Cir. 1981).

■ We conclude the government discharged its burden with respect to the warrantless entry of rooms 410 and 412. The agents had reasonable grounds to believe that at least two persons identified as the source of the five pounds of cocaine were present in the rooms. They had reason to believe these persons had a gun and two and a-half pounds of cocaine, and that at least one of them was likely to be violent. They also knew that the occupants of the rooms had sent a cohort to deliver the first two and a-half pounds of cocaine to purported buyers in another room in the same hotel, and expected him to return with $80,000 in cash, to be followed by the exchange of the remaining cocaine for another $80,000. The rooms were just six floors apart in the same hotel. The details of the two-part exchange had already been agreed to, and there was no reason to anticipate delay. Failure of the emissary to return as expected would inevitably alarm the waiting principals, creating a substantial risk that the remaining cocaine might be destroyed and that an armed escape might be attempted. Immediate action was therefore imperative.

The facts in this case are close to those held to justify warrantless entries in *United States v. Cuaron,* 700 F.2d at 585, and *United States v. Kunkler,* 679 F.2d at 189–90, and similar to those in *United States v. McLaughlin,* 525 F.2d 517, 519 (9th Cir. 1975); *United States v. Curran,* 498 F.2d 30, 35–36 (9th Cir.1974); and *United States v. Bustamante-Gamez,* 488 F.2d 4, 6–7 (9th Cir.1973).

Butner argues that a warrantless entry was not justified principally for three reasons: (1) the agents had probable cause to obtain a warrant before the arrests in Room 1003 precipitated the crisis; (2) the emergency arising from these arrests was foreseeable and avoidable; and (3) the destruction of evidence and danger of harm were in any event not certain or probable, but only possible.

■ (1) Butner argues that an hour and a half before the agents entered rooms 410–412, they had grounds to believe five pounds of cocaine were in these rooms or in Room 1003. This was ample time, Butner argues, to have obtained a telephonic warrant, and a warrantless entry was therefore not imperative. *See United States v. Robertson,* 606 F.2d 853, 860 (9th Cir.1979). However, the agents had nothing but Randall's verbal assurance that the suspects could provide cocaine. It was reasonable for them to permit the transaction to proceed until guilt had been clearly and unequivocally established by delivery of the cocaine.

■ (2) Alternatively, Butner argues that the agents proceeded with undue haste; that they could have permitted the entire transaction to be completed, thus gaining additional time that would have permitted the agents to obtain a warrant. The exigency created by the premature arrests in Room 1003, Butner argues, was foreseeable and avoidable and therefore cannot justify the warrantless entry into rooms 410 and 412. *See Vale v. Louisiana,* 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970); *United States v. Calhoun,* 542 F.2d 1094, 1102 (9th Cir.1976). However, this course of action would have required the agents to relinquish possession and control of $160,000 in cash. It would have led to unpredictable consequences with the five suspects in possession of the money, reunited, and then possibly separated and at large. The agents pursued a reasonable course of action by identifying the suspects, securing evidence of the crime, recovering the cocaine, and arresting the culprits.

(3) Finally, Butner argues that the risk that evidence would be destroyed or that danger to the agents would be enhanced by the delay necessary to obtain a telephonic warrant was too speculative and not sufficiently immediate to justify a warrantless entry.

■ A telephonic warrant may not be obtained simply by calling a magistrate. Among other things, a "duplicate original warrant" must be prepared in writing and read to the magistrate verbatim. *See United States v. Hackett,* 638 F.2d 1179, 1184–85 (9th Cir.1980); *United States v. Cuaron,* 700 F.2d at 589–90. Inexplicably, the government failed to introduce evidence regarding the time required to obtain a telephonic warrant, but in the circumstances of this case it is evident that the time required, however short, was not available. The clock began to run when the messenger left for Room 1003 to complete the first phase of the transaction. It was impossible to know how many minutes could be allowed to pass without arousing the waiting principals in rooms 410–412. Because of the close proximity of the locations and the prearrangement of the details of the transaction, no delay beyond that required by the officers to go from the tenth floor to the fourth floor could be considered safe. Once armed suspects in a drug transaction have been alerted to possible detection, the risk that delay in effecting an arrest will result in the destruction of the contraband and increase the danger of injury to the agents or others cannot be dismissed as merely speculative. *See, e.g., United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.1978); *United States v. Kunkler,* 679 F.2d at 192; *United States v. Curran,* 498 F.2d at 35–36; *United States v. McLaughlin,* 525 F.2d at

521; *United States v. Bustamante-Gamez,* 488 F.2d at 8–9.

### B. *Noncompliance with the "Knock and Announce" Statute*

 The government concedes the officers failed to comply with 18 U.S.C. § 3109 (1976) when entering rooms 410 and 412. They neither announced their purpose nor waited to be refused admittance before entering. It is settled, however, that a police officer's "reasonable belief that announcement might place him or his associates in physical peril . . . justifies non-compliance with the announcement provisions of the statute." *United States v. Kane,* 637 F.2d 974, 978 (3d Cir.1981). *Accord United States v. McShane,* 462 F.2d 5, 6 (9th Cir. 1972); *United States v. Smith,* 456 F.2d 1236 (9th Cir.1972); *Gilbert v. United States,* 366 F.2d 923, 932 (9th Cir.1966). Weggers told agents he had a gun in the hotel, but not in Room 1003. The agents knew he had come to Room 1003 from the fourth floor, and that Butner had returned to rooms 410–412 after listening to the transaction through the door of Room 1003. The agents had been advised that Butner was a violent person. Based on this evidence, the district court properly concluded the officers reasonably believed full compliance with section 3109 would have been perilous.

### II. *Contentions of Paul Manfredi and George Weggers*

### A. *The Speedy Trial Act Claim*

 Manfredi and Weggers contend their trial did not commence within the 70-day period specified by the Speedy Trial Act, 18 U.S.C. § 3161(c)(1). For purposes of the Act, trial in a jury case "commences" with the voir dire, *United States v. Nance,* 666 F.2d 353, 360 n. 18 (9th Cir.1982), and in this case the jury was impounded on April 21, the 70th day after the indictment was filed. Appellants argue, however, that because after impaneling the jury the court recessed the case for a week for its own convenience, the trial did not begin until April 27, when the first evidence was presented. We need not consider the effect of the recess because pretrial motions filed by Butner and Moore on March 11, 1981, stopped the clock for all defendants until the motions were disposed of on April 21, 1981. 18 U.S.C. §§ 3161(h)(1)(F), 3161(h)(7). *United States v. Davis,* 679 F.2d 845, 849 (5th Cir.1982); *United States v. Edwards,* 627 F.2d 460, 461 (D.C. Cir.1980). Exclusion of this period brings the April 27 date well within the statutory limit.

### B. *Proof the Substance Possessed was a Controlled Substance*

 Defendants argue there are several isomers of cocaine, at least one of which, d-cocaine, is neither derived from coca leaves nor chemically equivalent to coca leaf derivatives and is therefore not a "controlled substance" within the meaning of the statute. On this premise they argue (1) that the government failed to prove an essential element of the crime because there was no proof the substance was not d-cocaine; (2) that the court erred in instructing the jury that "cocaine" was a "controlled substance" without also instructing the jury that this instruction was not conclusive; and (3) that the court erred in rejecting their proposed instruction that if the government had proven the substance involved was "cocaine" without also specifically proving that the substance was a derivative of coca leaves or chemically equivalent to a coca leaf derivative, the government had failed to prove its case.

The government offered testimony by a forensic chemist on the staff of the Drug Enforcement Agency that he had tested samples of the substances possessed by the defendants "for the controlled substances" and had determined the samples contained "cocaine." Defendants did not cross-examine the government's expert, and offered no evidence that d-cocaine existed or, if it did, that it was not chemically equivalent to cocaine derived from coca leaves. Assuming the existence of forms of "cocaine" that are not "controlled substances" covered by the statute, the testimony of the government's witness clearly referred to those forms of cocaine that are within the category of "controlled substances" regulated by the statute. *United States v. Damitz,* 495

F.2d 50, 57 (9th Cir.1974). There was therefore no failure of proof of an essential element of the offense.

On these facts, the trial court did not err in instructing the jury that "cocaine" was a "controlled substance" within the meaning of the statute. Defendants concede that some forms of cocaine fall in this category, and the use of the generic term could have caused no confusion in the absence of proof that some lawful form of cocaine existed. In the context of this case, therefore, "cocaine" referred to cocaine derived from coca leaves or the chemical equivalent of such cocaine. The instruction simply stated the indisputable legal proposition that such cocaine fell within the statute. Accordingly, defendants' proposed instruction was properly refused for there was no basis in the evidence for the defense theory it suggested.

C. *John Bora's Testimony*

The district court conducted an *in limine* hearing to determine the admissibility of the testimony of John Bora, Butner's former brother-in-law. The court held admissible Bora's testimony about the relations between Weggers and Butner and their conversations about Bora's involvement in the cocaine traffic in the Bellingham area, but sustained Butner's objection to any testimony concerning Butner's dealings in drugs other than cocaine.

Before the jury, Bora testified he had been involved in cocaine trafficking with his sister, Butner's wife, but that Weggers and Butner ordered him to stop. He added that Butner had said he would furnish Bora with illegal drugs other than cocaine for resale. Defendants moved for a mistrial. The motion was granted as to Butner, who later submitted to a bench trial, but denied as to Weggers and Manfredi, who argue on appeal that because Bora's testimony was offered to show conspiracy among all the defendants, a mistrial should have been granted as to all. They offer no legal authority for this position, and we find no basis for it in the facts. The motion for mistrial was properly denied as to Weggers and Manfredi because they suffered no unfair prejudice from the testimony implicating Butner alone in the sale of other illegal drugs.

AFFIRMED.