**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Karnig SARKISSIAN, Steven Dadaian,**
**Viken Hovsepian,**
**Defendants/Appellants.**

**Nos. 85–5037–5039.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1987.

Decided March 10, 1988.

960

Barrett S. Litt, Los Angeles, Cal., for defendants/appellants.

Robert C. Bonner, Robert L. Brosio, and Terree A. Bowers, Los Angeles, Cal., for plaintiff/appellee.

Before ANDERSON, SKOPIL, and REINHARDT, Circuit Judges.

SKOPIL, Circuit Judge:

Sarkissian, Dadaian, and Hovsepian appeal their convictions for conspiracy to bomb, 18 U.S.C. § 844 (1982), transportation of explosive materials, 18 U.S.C. § 844(d), and possession of an unregistered firearm, 26 U.S.C. § 5861(d) (1982). They contend that (1) the government's warrantless search of a suitcase violated the fourth amendment; (2) the government was required to obtain wiretap authorization under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510–2521 (1986), not under the Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. §§ 1801–1811 (1982); and (3) the district court erred in not disclosing the government's ex parte in camera submission of classified information. We affirm.

## FACTS AND PROCEEDINGS BELOW

This case involves the Federal Bureau of Investigation's (FBI) attempt to prevent Armenian terrorists from bombing the Honorary Turkish Consulate in Philadelphia. On September 17, 1982, the FBI, as part of an ongoing investigation of Armenian terrorist groups, obtained authorization from the United States Foreign Surveillance Court (USFSC) to place a wiretap on Hovsepian's telephone in Santa Monica, California. The wiretap paid off from the start. Although defendants spoke in Armenian and used simple code words, FBI translators and investigators soon cracked the code. By late September the FBI knew that Hovsepian, Sarkissian, and others planned to take some type of violent action against the Honorary Turkish Consulate in Philadelphia and that they had a contact person in Boston. FBI Agent Maples, who headed the investigation in Los Angeles, believed that Hovsepian and others would act in early October.

Later intercepted phone calls convinced Maples that Hovsepian had postponed his plans. By October 19, Maples realized that Hovsepian's plans were on again; defendants were assembling a bomb. On October 21, the USFSC authorized a continuation of the surveillance. Shortly after 3:00 a.m. eastern daylight time (EDT), Maples discovered that one of Hovsepian's colleagues had missed a flight from Los Angeles but would take the next one, which would arrive at its destination at noon.

Maples and his agents continued the investigation through the early morning hours. He concluded that components of a bomb, if not an assembled bomb, were being transported from Los Angeles on an unidentified flight by an unidentified person or persons in unidentified luggage to an unidentified city. By checking the schedule of flights out of Los Angeles, Maples determined that the bomb's courier or couriers were probably on a Northwest Orient (NWO) flight due to arrive in Boston's Logan International Airport at noon EDT. He warned Boston's FBI office before 9:00 a.m. EDT of the danger.

At 9:10 a.m. EDT Maples discovered that the courier or couriers were "S. Tataian" and/or "V. Lopez." At 9:25 a.m. EDT Maples concluded that defendant Dadaian was probably one of the couriers. At 9:30 a.m. EDT he called Boston FBI agent Hildreth to warn that the suspect or suspects apparently were on a Trans World Airlines or NWO flight that would arrive at about 11:00 a.m. or noon EDT following stop-overs in Minneapolis and New Jersey. Maples provided Hildreth with the names of four suspects. Between 9:45 and 10:00 a.m. EDT, Maples told Hildreth to disregard the names provided earlier. He advised Hildreth to focus on Dadaian who was on the NWO flight due to arrive at noon EDT. Maples gave Hildreth a general physical description of Dadaian.

Around 9:30 a.m. EDT the Boston FBI sent an agent to Logan Airport to to set up a command post. By 11:00 a.m. EDT fifty agents had assembled at the airport. The agents manned surveillance positions and established a search procedure that includ-

ed a dog sniff and x-ray scan. After the NWO flight landed around 12:15 p.m. EDT, a Massachusetts state police officer boarded the plane and posed as a first class passenger. The officer spotted a man matching Dadaian's description and followed him to the baggage claim area.

A trained dog sniffed the fifty-seven pieces of luggage unloaded from the flight, but did not react to any of them. The agents then ran the luggage through the x-ray scanner and detected parts of a bomb in a suitcase labeled "V. Lopez." They opened the suitcase and found an unassembled bomb with five sticks of dynamite. The agents did not remove anything from the suitcase, but returned it to the baggage claim carousel. His suspicions aroused by activity around the airport, Dadaian never picked up the suitcase. The FBI arrested him several hours later.

At trial the defendants sought to suppress evidence from the suitcase search and FISA wiretap. The district court denied their suppression motions. The government also made an ex parte in camera submission of classified information. The court sealed the submission without allowing disclosure to the defendants. Defendants were found guilty of conspiracy to bomb, transportation of explosive materials, and possession of an unregistered firearm. They timely appealed.

## DISCUSSION

### A. Warrantless Search

■ A warrantless search of luggage requires exigent circumstances supported by probable cause. *United States v. Nikzad*, 739 F.2d 1431, 1433 (9th Cir.1984). Defendants concede probable cause. The issue is whether there were exigent circumstances. Exigent circumstances include "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons...." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We view the exigency from the totality of circum-

stances known to the officer at the time of the warrantless intrusion. *United States v. Licata*, 761 F.2d 537, 543 (9th Cir.1985). We review a conclusion of exigent circumstances de novo and findings of fact for clear error. *United States v. Alvarez*, 810 F.2d 879, 881 (9th Cir.1987).

■ We conclude there were exigent circumstances in this case. The FBI knew that a bomb or parts of a bomb were being carried in a suitcase or suitcases by a member or members of an Armenian terrorist group on a commercial flight to an international airport. *See United States v. Chadwick*, 433 U.S. 1, 15 n. 9, 97 S.Ct. 2476, 2485 n. 9, 53 L.Ed.2d 538 (1977) (recognition of exigency created by placement of "some immediately dangerous instrumentality, such as explosives" in luggage); *United States v. Al–Azzawy*, 784 F.2d 890, 893 (9th Cir.1985) (explosives in trailer), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *United States v. Williams*, 626 F.2d 697, 703 (9th Cir.) (bomb in car), *cert. denied*, 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980).

The FBI believed that defendants belonged to the Justice Commandoes of the Armenian Genocide (JCAG). Members of the JCAG were considered "armed and dangerous." An FBI report noted that "they have accomplished some 21 assassinations worldwide and numerous bombings of Turkish targets. JCAG members are known to carry concealed hanguns [sic], and to prefer 9mm browning hi-powered automatics, or .45 caliber colt combat commandos automatics." The FBI attributed three assassinations earlier in the year to the JCAG. One assassination occurred in Los Angeles on January 28, 1982, another in Boston on May 4, 1982, and a third in Ottawa, Canada on August 27, 1982. The JCAG often used bombing as a warning to be followed by an assassination attempt.

The Philadelphia FBI estimated heavy civilian casualties if the JCAG managed to detonate its bomb. The Honorary Turkish Consulate was located "in a highly populated area which has continuous activity at all hours of the day and night." A bomb

composed of six sticks of dynamite would cause at least 100 casualties. A daytime explosion could inflict as many as 2,000 to 3,000 casualties. If a shoot out between the FBI and JCAG occurred, "people in the various residence units bordering on the site of the building would be expected to rush to the windows to see what was happening. If that occurs and the bomb was not able to be deactivated the minimal number of casualties would be substantially higher." We agree with the district court's finding that there was a "grave and imminent danger to persons and property."

Exigent circumstances alone, however, are insufficient. The government also bears the burden of showing that it could not have obtained a telephonic warrant under Fed.R.Crim.P. 41(c)(2). *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir. 1983). It must "attempt, in good faith, to secure a warrant or ... present evidence explaining why a telephone warrant was unavailable or impractical." *Alvarez*, 810 F.2d at 883 (footnote omitted).

■ Here, the government did not attempt to obtain a telephonic warrant. The record, however, contains evidence showing why it would have been impractical to do so. *See United States v. Andersson*, 813 F.2d 1450, 1455 (9th Cir.1987); *Manfredi*, 722 F.2d at 523. Probable cause to search arose almost three hours before the plane landed. By 9:25 a.m. EDT Maples had concluded that Dadaian was the bomb's courier. The plane was scheduled to land at noon EDT but actually landed around 12:15 p.m. EDT. Although the investigation preoccupied Maples throughout the early morning hours, after 10:00 a.m. EDT he did little but wait to "see what happened." Maples never considered trying to get a telephonic warrant. Though we find that troubling, we affirm.

The impracticality of obtaining a warrant compels that result. "Obtaining a telephonic warrant is not a simple procedure; '[a]mong other things, a "duplicate original warrant" must be prepared in writing and read to the magistrate verbatim.' The only step that is saved is the trip to the magistrate's office." *United States v. Good*, 780

F.2d 773, at 775 (9th Cir.1986) (quoting *Manfredi*, 722 F.2d at 523). Here, the procedure was complicated by the fact that the agents with the information were in Los Angeles. Fed.R.Crim. P. 41(a) requires that the warrant be issued by a judicial officer of the district where the property to be seized is located. Thus, the Los Angeles agents would have needed to locate a judicial officer in Boston, prepare a warrant, and then convince the judicial officer that probable cause existed. Fed.R.Crim. P. 41(c)(2)(B) and (C). The district court found that no written summary of the necessary information was then in existence and that collecting and organizing the information would have been difficult.

■ The passage of time alone is not dispositive of whether the government had enough time to secure a warrant. *Cf. Alvarez*, 810 F.2d at 883 n. 5 (court has never held that any specific amount of time was per se insufficient). In *Alvarez*, government agents had at least ninety minutes in which to get an arrest warrant. *Id.* at 883. The agents made no attempt to secure the hotel where the drug deal was to occur or to monitor the suspect's movements before making a warrantless arrest. *Id.* at 882. We refused to find exigent circumstances. "The agent's actions ... were ... fundamentally inconsistent with any true exigency." *Id.* In *Echegoyen*, police officers waited approximately two and one-half to three hours before making their search. 799 F.2d 1271, at 1279 n. 6. "The officers were faced with a potentially serious fire hazard and potentially dangerous drug traffickers in an isolated mountain community with little fire and police protection." *Id.* at 1280. We found exigent circumstances. *See also United States v. Picariello*, 568 F.2d 222, 226 (1st Cir.1978) (warrantless entry nearly five hours after development of probable cause).

This case is closer to *Echegoyen* than to *Alvarez*. In extraordinary cases, the peril may be so great that law enforcement officers must be afforded sufficient latitude to direct their full attention to protecting lives and property. *See United States v. Jones*, 635 F.2d 1357, 1362 (8th Cir.1980) ("[T]he

police were busily engaged in solving the problem, which they continued to believe was a dangerous one."); *Picariello,* 568 F.2d at 226 ("The emergency conditions ... and the reasonable speed with which the agents acted substantiate a finding of exigent circumstances."); *United States v. Melville,* 309 F.Supp. 829, 832 (S.D.N.Y. 1970) (Police action to halt wave of bombings in New York and to secure explosives in apartment "cannot be judged in the calm of later philosophical review of what a phlegmatic analysis shows.").

The Boston FBI had to safeguard the people and property within the airport. The FBI set up a command post, contacted and coordinated efforts with the state police and a bomb expert, briefed the fifty agents assembled at the airport and assigned them to their posts, and set up a procedure to check for explosives. Uncertainty made the FBI's task more difficult. The FBI did not know the identity of the courier or couriers, whether the bomb was assembled or unassembled, whether the bomb was contained in one or more suitcases, and what the suitcase or suitcases looked like. Events rapidly unfolded. *See Andersson,* 813 F.2d at 1455. Here, the potentially violent consequences to the law enforcement agents and the public combined with the considerable amount of time required for the Los Angeles agents to gather the information and obtain a judicial officer's approval justify the warrantless search. Based on the totality of the circumstances, we conclude the time was insufficient to obtain a warrant.

## B.  FISA

■  Congress enacted FISA in 1978 "to establish procedures for the use of electronic surveillance in gathering foreign intelligence information." *Matter of Kevork,* 788 F.2d 566, 569 (9th Cir.1986). The government generally must obtain judicial approval before it engages in such surveillance. *United States v. Cavanagh,* 807 F.2d 787, 788 (9th Cir.1987). A specially constituted court, the USFSC, hears the government's application. 50 U.S.C. § 1803. The Chief Justice of the Supreme Court designates seven United States Dis-

trict Court judges to serve on the court. *Id.*

On Oct. 21, 1982 the USFSC authorized the FBI to continue its wiretap of Hovsepian's telephone. Defendants argue that by then the FBI's primary purpose for the surveillance had shifted from an intelligence investigation to a criminal investigation. They contend that (1) the FBI was required to obtain authorization under Title III, not FISA; and (2) the district court erred in not allowing a hearing on the issue. We disagree.

Defendants rely on the primary purpose test articulated in *United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir.1980). *Truong* held that the foreign intelligence exception to the warrant requirement applies "only when the surveillance is conducted 'primarily' for foreign intelligence reasons." *Id.* at 915. One other court has applied the primary purpose test. *United States v. Duggan,* 743 F.2d 59, 77 (2d Cir. 1984). Another court has rejected it. *United States v. Falvey,* 540 F.Supp. 1306, 1313–14 (E.D.N.Y.1982) (distinguishing *Truong*). A third court has declined to decide the issue. *Matter of Kevork,* 634 F.Supp. 1002, 1015 (C.D.Cal.1985), *aff'd,* 788 F.2d 566 (9th Cir.1986).

We also decline to decide the issue. We have generally stated that the purpose of the surveillance must be to secure foreign intelligence information. *United States v. Ott,* 827 F.2d 473, 475 (9th Cir.1987); *Cavanagh,* 807 F.2d at 790–91 ("the purpose of the surveillance is not to ferret out criminal activity but rather to gather intelligence"); *accord United States v. Badia,* 827 F.2d 1458, 1463–64 (11th Cir.1987). Regardless of whether the test is one of purpose or primary purpose, our review of the government's FISA materials convinces us that it is met in this case. It follows then that defendants were not entitled to a hearing. *See United States v. Belfield,* 692 F.2d 141, 147 (D.C.Cir.1982) ("Disclosure and an adversary hearing are the exception, occurring *only* when necessary."); 50 U.S.C. § 1806(f) (providing for ex parte in camera review).

We refuse to draw too fine a distinction between criminal and intelligence investigations. "International terrorism," by definition, requires the investigation of activities that constitute crimes. 50 U.S.C. § 1801(c)(1). That the government may later choose to prosecute is irrelevant. FISA contemplates prosecution based on evidence gathered through surveillance. *See* 50 U.S.C. § 1806. "[S]urveillances ... need not stop once conclusive evidence of a crime is obtained, but instead may be extended longer where protective measures other than arrest and prosecution are more appropriate." S.Rep. No. 701, 95th Cong., 2d Sess. 11, *reprinted in* 1978 U.S. Code Cong. & Admin.News 3973, 3980.

FISA is meant to take into account "[t]he differences between ordinary criminal investigations to gather evidence of specific crimes and foreign counterintelligence investigations to uncover and monitor clandestine activities ..." *Id.*, 1978 U.S.Code Cong. & Admin.News at 3983. At no point was this case an ordinary criminal investigation. *See Badia*, 827 F.2d at 1461 (conspiracy to manufacture machine guns and silencers for "Omega-7," an anti-Castro group); *Duggan*, 743 F.2d at 78 (IRA attempt to buy parts for bombs and surface-to-air missiles); *Kevork*, 634 F.Supp. at 1015 (Armenian terrorist plot to assassinate Turkish diplomat); *Falvey*, 540 F.Supp. at 1314 (IRA arms smuggling).

## C. Ex Parte In Camera Material

Defendants contend that the district court erred in not disclosing material submitted to the district court ex parte and in camera. They argue that (1) the court impermissibly balanced the parties' interests under the Classified Information Procedures Act (CIPA), 18 U.S.C.App. §§ 1–16 (1982); (2) the court erred in accepting an ex parte in camera submission without requiring the filing of a public claim of privilege; and (3) the government failed to assert a formal claim to a state secret privilege under *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). We again disagree.

Congress passed CIPA to prevent the problem of "graymail," where defendants pressed for the release of classified information to force the government to drop the prosecution. S.Rep. No. 823, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4294, 4297. CIPA permits "the trial judge to rule on questions of admissibility involving classified information before introduction of the evidence in open court. This procedure ... permit[s] the government to ascertain the potential damage to national security of proceeding with a given prosecution before trial." *Id.*, 1980 U.S.Code Cong. & Admin. News at 4294. CIPA creates a pretrial procedure for ruling upon the admissibility of classified information. *United States v. Smith*, 780 F.2d 1102, 1105 (4th Cir.1985) (en banc). *See generally United States v. Collins*, 720 F.2d 1195, 1196–97 (11th Cir. 1983).

■ Defendants argue that CIPA forbids balancing national security concerns against defendant's need for documents. Their argument is meritless. Congress intended section 4 to clarify the court's powers under Fed.R.Crim.P. 16(d)(1) to deny or restrict discovery in order to protect national security. S.Rep. No. 823, 96th Cong., 2d Sess. 6, *reprinted in* 1980 U.S.Code & Cong.News 4299–4300. On issues of discovery, the court can engage in balancing. *Id. See also United States v. Pringle*, 751 F.2d 419, 426–27 (1st Cir.1984).

■ Defendants next contend that the government must file a public claim of privilege before making an ex parte in camera submission. The clear language of the statute and its legislative history foreclose that contention. Section 4 allows the court to "permit the United States to make a request ... in the form of a written statement to be inspected by the court alone." 18 U.S.C.App. § 4. *See Pringle*, 751 F.2d at 427. The legislative history emphasizes that "since the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules." H.R.Rep. No. 831, 96th Cong., 2d Sess. 27 n. 22. Nowhere does CIPA require the government to file a public claim of privilege

before making an in camera ex parte submission.

Defendants finally argue that the government failed to make a formal claim of state secret privilege under *Reynolds*, 345 U.S. 1, 73 S.Ct. 528. *Reynolds* requires "a formal claim of privilege, lodged by the head of the department which has control over the matter after actual personal consideration by that officer." *Id.* at 7–8, 73 S.Ct. at 532 (footnotes omitted). We assume *arguendo* that the enactment of CIPA does not affect the validity of *Reynolds*. We have examined the government's sealed submission and conclude that it satisfies *Reynolds*.

The district court is AFFIRMED.