UNITED STATES of America,
Plaintiff,

v.

Ahmed RESSAM, Defendant.

No. CR99–666C.

United States District Court,
W.D. Washington,
At Seattle.

Aug. 15, 2002.

ORDER (AS AMENDED)

COUGHENOUR, Chief Judge.

## I. BACKGROUND

Defendant Ahmed Ressam was arrested in December 1999 in Port Angeles, Washington, having just arrived in the United States on a car ferry from Victoria, British Columbia. The trunk of his car contained over a hundred pounds of bomb components and several timing devices. It was later discovered that Ressam was an Al-

gerian citizen and a member of a terrorist cell based in Montreal and that the intended destination of the explosives was Los Angeles International Airport. After a four-week trial in March and April of 2001, Ressam was convicted of nine counts, including conspiracy to commit an act of international terrorism. He is currently awaiting sentencing.

On October 17, 2001, the Seattle Times requested that the pleadings in this case be unsealed pursuant to the public's First Amendment and common law right of access (Dkt. No. 315). This Order represents the Court's third review of documents in this action following the Seattle Times' letter. The Court's first Order addressed seven documents the United States agreed to unseal in redacted form (Dkt. No. 328). The Court then reviewed seven more documents and approved the Government's request to keep them sealed in their entirety because they contained information related to national security and an ongoing criminal investigation (Dkt. No. 330).

The list below describes the docket entries of the thirteen documents that are the subject of this Order. Ten of the thirteen documents were submitted under seal on three separate occasions for *ex parte, in camera* discovery determinations by the Court pursuant to the Classified Information Procedures Act, 18 U.S.C. app. 3 (1994) ("CIPA"). The other three documents are protective orders related to the CIPA hearings and were issued by the Court under seal.

| Document | Docket No. | Date Filed |
|---|---|---|
| 1. *Ex Parte, In Camera* Motion for Protective Order | 150 | 11/30/2000 |
| 2. *Ex Parte, In Camera* Memorandum in Support of Motion for Protective Order | 151 | 11/30/2000 |
| 3. *Ex Parte, In Camera* Declaration of Dale L. Watson, Assistant Director, FBI | 152 | 11/30/2000 |
| 4. Appendix A | 153 | 11/30/2000 |
| 5. Protective Order | 154 | 12/21/2000 |
| 6. First Supplemental *Ex Parte, In Camera* Motion for Protective Order | 166 | 01/25/2001 |
| 7. First Supplemental *Ex Parte, In Camera* Memorandum in Support of Motion for Protective Order | 167 | 01/25/2001 |
| 8. First Supplemental *Ex Parte, In Camera* Declaration of Dale L. Watson | 168 | 01/25/2001 |
| 9. Protective Order | 170 | 02/02/2001 |
| 10. Second Supplemental *Ex Parte, In Camera* Motion for Protective Order | 200 | 03/05/2001 |
| 11. Second Supplemental *Ex Parte, In Camera* Memorandum in Support of Motion for Protective Order | 201 | 03/05/2001 |
| 12. *Ex Parte, In Camera* Declaration of William H. McNair, Information Review Officer for the CIA | 202 | 03/05/2001 |

13. Protective Order 212 03/09/2001

**The Docket also reflects the lodging of two proposed orders associated with the CIPA proceedings. The proposed orders have no docket numbers, but were entered on the docket with filing dates of 11/30/2000 and 03/05/2001.**

In its preparation for trial, the Government conducted a comprehensive search of a number of federal agencies with intelligence and national security functions and found classified documents that contained potentially discoverable information. Pursuant to section 4 of CIPA, Rule 16(d)(1) of the Federal Rules of Criminal Procedure and applicable case law, the Court authorized the Government to file an *ex parte, in camera* motion for a protective order regarding these classified documents. Subsequently, on November 30, 2000, January 25, 2001 and March 5, 2001, the Government submitted documents containing more classified materials and requested that the Court make pretrial rulings limiting the defendant's access to the classified documents it had come across in its review of the federal agencies. As a result of the showing the Government made for each of the three motions, the Court made the necessary findings regarding the classified nature of the information and the likely damage to the national security if the information were released and issued the sealed protective orders of December 21, 2000, February 2, 2001 and March 9, 2001. Each of the three protective orders authorized the Government to provide the defendant with an unclassified substitute, thereby satisfying its discovery obligations. In addition, the December 21, 2000, and February 2, 2001, Orders concluded that some of the classified information was non-discoverable and need not be summarized in unclassified form for the defendant.

On November 2, 2001, the Government submitted an *Ex Parte, In Camera* Memorandum of Law in Opposition to the Request by the Seattle Times to Unseal CIPA–Related Materials Submitted by the United States in the Ressam Case (Dkt. No. 326). In this sealed document, the United States described the history of the proceedings and the reasons why the documents contained in the list above were classified. Its arguments against the unsealing of all CIPA-related materials are threefold. First, the Government contends that the classified materials were properly sealed by the Court and remain beyond the scope of the public's First Amendment right of access. Even assuming *arguendo* that the right of public access attaches to the classified materials, the Government contends that continued non-disclosure is required to protect the compelling interests of national security, particularly in the aftermath of September 11. Finally, the Government argues that CIPA, as well as the statute's implementing regulations promulgated by the U.S. Supreme Court, greatly restrict the judicial branch's authority to disclose classified information that has been designated as such for *ex parte, in camera* review under CIPA by the Executive Branch.

The Court issued an Order regarding the CIPA-related materials on July 24, 2002. This Amended Order takes into account the Government's Amended Motion to Reconsider or Amend filed on August 2, 2002 (Dkt. No. 339).

## II. ANALYSIS

 In four cases decided in the 1980s, the Supreme Court recognized and

developed the public's First Amendment right to attend criminal judicial proceedings. *See Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II "*); *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I "*); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *see also* Samuel B. Sokol, Comment, *Trying Dependency Cases in Public: A First Amendment Inquiry,* 45 UCLA L.Rev. 881, 884–901 (1998). Specifically, the Court held that all criminal trials, as well as related proceedings such as preliminary hearings and jury selection, were to be open to the public. The public's right of access, however, is not all-encompassing, but rather is determined by examining the history and logic of the public's access to the proceeding in question. *See Press–Enterprise II,* 478 U.S. at 8–10, 106 S.Ct. 2735. Even when the right of access is established, it is a qualified right that can be overcome "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. 819.

 Thus, before applying a strict scrutiny test to determine whether closure of the proceedings is warranted, *see Oregonian Publ'g Co. v. U.S. Dist. Court,* 920 F.2d 1462, 1466 (9th Cir.1990) (applying three-part test and citing *Press–Enterprise II,* 478 U.S. at 13–14, 106 S.Ct. 2735),[1] the court must determine whether the right of access attaches to the particular proceedings or documents at issue. In doing so, the court is required to examine whether: (1) the proceeding has "historically been open to the press and general public" and (2) "the right of access [to the proceeding] plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Globe Newspaper,* 457 U.S. at 605–06, 102 S.Ct. 2613. In short, the court must decide whether the dual " 'considerations of experience and logic' cut in favor of a First Amendment right of access" or are instead outweighed by the costs of disclosure to the administration of justice. *Times Mirror Co. v. United States,* 873 F.2d 1210, 1213 (9th Cir.1989) (quoting *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. 2735).

In applying the basic "logic and experience" test, lower courts have extended the public's right of access well beyond attendance at criminal proceedings. *See* Sokol, *supra,* at 897–901 (citing cases). The Ninth Circuit, as the Government acknowledges in its brief, has extended the right to several stages of a criminal proceeding as well as to the documents filed in association with those stages. Applying a general presumption of openness, the Ninth Circuit has held that the right extends to both pretrial and post-trial proceedings. *See Oregonian Publ'g,* 920 F.2d at 1466 (plea agreements and related documents); *Seattle Times Co. v. U.S. Dist. Court,* 845 F.2d 1513, 1514–17 (9th Cir.1988) (documents associated with a pretrial detention hearing that was held in open court); *CBS, Inc. v. U.S. Dist. Court,* 765 F.2d 823, 825 (9th Cir.1985) (documents associated with a post-trial motion under Rule 35); *Assoc.*

---

**1.** This Court's previous orders resulting from the Seattle Times' request (Dkt. Nos. 328, 330) only focused on the strict scrutiny standard for closure of documents because the Government did not contest the public's First Amendment right to access them.

*Press v. U.S. Dist. Court,* 705 F.2d 1143, 1145 (9th Cir.1983) (pretrial documents in general); *United States v. Brooklier,* 685 F.2d 1162, 1170 (9th Cir.1982) (voir dire, suppression hearings and transcripts of closed proceedings).

One commentator has observed that the only situations in which lower courts have failed to find a qualified right of access are those in which "some element of the proceeding under consideration is fundamentally inconsistent with publicity." Sokol, *supra,* at 898. For example, the Seventh Circuit in *B.H. v. McDonald,* 49 F.3d 294 (7th Cir.1995), held the public had no right to attend an in-chambers conference in a class action suit in part because the entire purpose of the conference was to facilitate candid discussion away from the public spotlight. The Second Circuit has ruled that the right of access does not attach to information in a criminal case that the court determines is non-discoverable following *in camera* review. *United States v. Wolfson,* 55 F.3d 58 (2d Cir.1995). Similarly, the Ninth Circuit narrowly denied a media request to access search warrants and supporting documents related to an ongoing pre-indictment investigation. *Times Mirror,* 873 F.2d at 1213–16 (noting that warrants are typically issued after an *ex parte* application and *in camera* consideration by the court and comparing the importance of secrecy in both warrant and grand jury proceedings).

 This Court is unaware of any case in the Ninth Circuit, or any other Court of Appeals, that has addressed whether the supporting documents and resulting protective order in an *ex parte, in camera* hearing pursuant to sections 4 and 6 of CIPA are subject to the qualified right of access to criminal proceedings and documents. Thus, to resolve this issue of first impression, the Court must undertake the two-part "consideration of experience and logic."

### A. CIPA–Related Materials Submitted by the United States

 This Court is unaware of any "tradition of access" to documents that are submitted as part of an *ex parte, in camera* hearing to determine whether certain information in the Government's possession is discoverable. Although *Wolfson* only dealt with a request to unseal the actual documents the court had held to be non-discoverable under *Brady* and the Jencks Act, rather than the submissions supporting the Government's non-disclosure argument, the basic reasoning in that case applies here. When the materiality or relevance of potential evidence in a criminal proceeding is contested, the documents are typically submitted to the court for *in camera* review. This procedure preserves the confidentiality of the information that the court determines is non-discoverable. *Wolfson,* 55 F.3d at 60 (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 59–61, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). Concluding its analysis of the experience factor, the *Wolfson* court reasoned that it was "unaware of any traditional right of access on the part of the public to documents to which the defendant himself has been denied access." *Id.* Likewise, the public has not historically had access to the prosecution's arguments in support of non-disclosure, particularly when they are made during an *in camera* hearing. It necessarily follows that there is no tradition of access to the supporting documents in CIPA proceedings, which are, by their very nature, *ex parte, in camera* discovery determinations.

 In assessing whether public access to CIPA-related materials would play

a "significant positive role" in the judicial process, it is necessary to consider the elaborate procedures CIPA provides for protecting classified information. "Congress enacted CIPA to prevent the problem of 'graymail,' where defendants pressed for the release of classified information to force the government to drop the prosecution." *United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir.1988) (citing S.Rep. No. 96–823, at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N 4294, 4297); *see also United States v. Klimavicius–Viloria,* 144 F.3d 1249, 1260–62 (9th Cir.1998); *In re Washington Post Co.,* 807 F.2d 383, 393 (4th Cir.1986) (contrasting a sealed, *in camera* plea hearing with discovery determinations under CIPA). Pursuant to section 4 of CIPA, a court may authorize the Government to delete specific classified information from discoverable material or to provide summaries or admissions of relevant facts as substitutes. 18 U.S.C. app. 3, § 4 (1994). Section 4 also provides:

> The court may, permit the United States to make a *written request for such authorization in the form of a written statement to be inspected by the court alone.* If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

*Id.* (emphasis added). Further, *ex parte in camera* hearings for the purpose of pretrial discovery rulings are entirely consistent with CIPA. *See Klimavicius–Viloria,* 144 F.3d at 1261. The Ninth Circuit has also held that the Government need not file a public claim of privilege before making an *ex parte, in camera* submission because of CIPA's plain language as well

as its legislative history recognizing the inherent contradiction between "the government['s] seeking to withhold classified information from the defendant [and] an adversary hearing with defense knowledge...." *Sarkissian,* 841 F.2d at 965 (quoting H.R.Rep. No. 96–831, at 27 n. 22).

▪ In addition to analyzing the structure and purpose of CIPA, the Government's argument compares the importance of *in camera* CIPA hearings with the secrecy necessary to the functioning of the grand jury. The Court also finds it significant that evidentiary determinations regarding classified information are questions of law, the public resolution of which would not materially enhance either the fairness or public perception of the process, *see Klimavicius–Viloria,* 144 F.3d at 1264. In sum, it is clear from the purpose and statutory language providing for the *in camera* procedures of CIPA that public access to the information reviewed by the court (and held to be non-discoverable) as well as the written statements submitted by the United States in support of non-disclosure plays no significant role in the judicial process of determining whether classified information is subject to disclosure to the defense and possible subsequent introduction at trial. In fact, opening this proceeding to the public would negate CIPA's very purpose.

▪ It is important to make clear that the Court is not using Congress's enactment of CIPA to override the constitutional right of access. *See United States v. Poindexter,* 732 F.Supp. 165, 167 n. 9 (D.D.C.1990) ("While CIPA obviously cannot override a constitutional right of access...."). At least two district courts have examined the interaction of the procedures established by CIPA and the right of access to parts of a criminal trial and

have rejected the use of CIPA itself as a grounds for closure of the criminal proceeding.

In *United States v. Pelton*, 696 F.Supp. 156 (D.Md.1986), the Government wanted to introduce two tape-recordings containing classified information against a defendant on trial for espionage. *Id.* at 156. Concerned about causing damage to national security, the Government sought to play the tapes through headphones only to the jury, court, counsel and defendant. *Id.* While the courtroom's gallery would remain open to the public, no one else would be permitted to listen to the tapes. *Id.* Two media organizations intervened seeking access to the tapes. *Id.* at 157. Faced with the issue of a limited closure of the trial, the court disagreed with the Government's argument that CIPA itself provided a statutory basis for closure. *Id.* Applying a presumption against closure of criminal trial proceedings, *id.* at 159, the court ultimately found that the national security interests at issue in the materials warranted "deletion of certain, very limited portions of the transcript." *Id.* The court reached this conclusion only after conducting its own *in camera* review of the classified transcripts and a classified affidavit submitted by the Government explaining the nature of its concerns. *Id.* at 158–59.[2]

In the prosecution of the former National Security Advisor John Poindexter, the court had ordered former President Ronald Reagan to testify by videotaped deposition. *Poindexter*, 732 F.Supp. at 166. Several media organizations sought permission to attend the direct and cross-examination of the former president. *Id.* Noting that the *in camera* deposition proceedings would have two aspects—a "CIPA-type hearing" to determine the admission of classified information into evidence and the recording of testimony for use at the trial—the court stated as to the former that "[c]learly, the press and the public are not entitled to attendance during the CIPA aspects of the hearing." *Id.* at 168. Considering the experience and logic factors to determine whether the former president's testimony was subject to the right of public access, the court again referred to CIPA, not as a means of overriding the constitutional right, but rather as "indicative of a tradition and common usage in a situation involving sensitive information." *Id.* at 167 n. 9. The court went on to reject opening the deposition testimony to the public on the condition that the transcript be redacted and released immediately following the proceeding. *Id.* at 169–70.

While both *Poindexter* and *Pelton* clearly hold that CIPA cannot negate the public's First Amendment right of access to criminal trials or closely related pretrial proceedings, neither case is inconsistent with continued closure of the CIPA-related materials in this action. As an initial matter, both cases involved testimony and evidence that was integrally involved in the actual presentation to the jury. As the Supreme Court has made clear, the criminal trial itself is the most fundamental judicial proceeding to which the First Amendment right attaches. Here, in contrast, the Times' request to unseal documents involves information submitted solely for the purpose of aiding the Court in making pretrial discovery determinations regarding classified information. Thus,

---

**2.** It is not clear from the opinion whether the Government's affidavit in support of closure was submitted pursuant to CIPA; however, unlike the present case, the media in *Pelton* did not seek access to the affidavit.

not only are the circumstances of the proposed closure distinguishable, but *Poindexter*, in dicta, even states that a CIPA-type hearing would clearly be off limits to the public. *Poindexter* further supports the use of CIPA to analyze the experience prong of the public access inquiry. *See* 732 F.Supp. at 167 n. 9.

In sum, the foregoing analysis of the logic and experience factors regarding public access to *ex parte, in camera* CIPA hearings strongly suggests that the public has no First Amendment right of access to the CIPA-related materials submitted by the United States.[3] Neither *Poindexter* nor *Pelton* contradict this result, and in fact provide support, albeit in dicta, for it.

In addition to addressing the First Amendment right of access to the documents it submitted as part of the CIPA proceeding, the Government's brief also appears to contemplate the possibility that the Court might order disclosure of the potentially discoverable classified materials that brought about the need for the three CIPA hearings in the first place. It compares these materials with the supporting (and also classified) memoranda, declarations and proposed protective orders and contends that the continued closure of the latter documents is necessary, not only because they contain numerous references to the classified information at issue, but because CIPA requires them "to

be inspected by the court alone." 18 U.S.C. app. 3, § 4. The Court does not read the Seattle Times' request to encompass the underlying classified documents, but rather only to apply to the records that appear in the Court's docket. In fact, the hearing held at the Seattle Times' request on October 26, 2001, focused primarily on identifying the docket numbers corresponding to sealed documents. (*See* Tr. of Proceedings, Dkt. No. 327.)[4] Thus, despite the Government's argument addressing the underlying classified information, this Order merely addresses the right of access to the documents entered in the docket for this case.

The distinction between the underlying, potentially discoverable material and the written arguments in support of finding that material non-discoverable highlights the important difference between this case and *Wolfson*. In *Wolfson*, the court was faced with a request by the defendant, almost twenty-five years after his conviction, to unseal a key witness's earlier testimony before the SEC as well as the Government's notes related to the testimony. 55 F.3d at 59. The motion to unseal, therefore, focused exclusively on documents that the trial court had held to be non-discoverable and had sealed for appellate review. The Second Circuit, as discussed above, held that there was no logic or tradition of public access to documents "to which the defendant himself has been

---

3. It is worth noting that while the Seattle Times' request focuses on the First Amendment right, the *Wolfson* court rejected a related argument that the public's common law right to inspect and copy public documents, including court papers, embraces documents submitted for *in camera* review. 55 F.3d at 61 (holding that non-discoverable materials were not public documents).

4. Admittedly, the sealed documents put the Seattle Times at a disadvantage in terms of

specifying the information to which it seeks access. *See* Letter of October 17, 2001, at 3. ("The docket information available to the public is so sparse that the public has no information regarding the subject matter of the various motions or the Court's rationale for allowing secrecy.") Nonetheless, the Times did not raise the issue of disclosing the underlying classified documents at the oral argument.

denied access." *Id.* at 60. Here, however, the underlying documents for which the Court approved unclassified substitutes, or which it held to be non-discoverable, are outside the scope of the Seattle Times' request. This distinction is, ultimately, of no consequence, for the Court's consideration of the experience and logic associated with public access to the documents submitted by the Government as part of an *ex parte, in camera* CIPA hearing leads to the same result as in *Wolfson*. Because the logic and experience inquiry is answered in the negative, the Court concludes that the First Amendment right of access does not attach to the CIPA-related documents submitted by the United States. The Government consequently has no obligation to demonstrate that other compelling interests override this qualified right of access.

## B. The Court's Protective Orders

Following each of the United States' three submissions of classified information, the Court issued protective orders making the required findings and authorizing the Government to satisfy its discovery obligations by producing an unclassified summary for the defendant. (*See* Dkt. Nos. 154, 170 and 212). Although these orders were originally submitted by the Government as "proposed" orders along with the other CIPA-related materials, the Court's signature converts the Government's submissions into the official statement of the Court resolving the motion and explaining the basis for its decision.[5] As a result of this important difference created by the Court's imprimatur, the sealed protective

orders cannot be analyzed in the same manner as the Government's submissions even though the final protective order may be substantively identical to the proposed protective order.

### 1. The Public's First Amendment Right of Access

 Applying the same logic and experience inquiry, the Court reaches a different conclusion as to the public's right of access to its signed protective orders. First, there is a venerable tradition of public access to court orders, not only because of the inherent value in publicly announcing a particular result, but because dissemination of the court's reasoning behind that result is a necessary limitation imposed on those entrusted with judicial power. A court's order therefore serves a function that extends far beyond a specific case. More than merely informing the parties of the outcome of a motion, an order also enlightens the public about the functioning of the judicial system. One might argue that protective orders, because of their frequent references to sensitive information, generally deserve a higher degree of scrutiny before they are publicly disclosed, yet the Court does not find this legitimate concern sufficient to overcome the long history of general public access to court orders. Further, it is significant that CIPA itself, while specifying the sealing of *in camera* proceedings and the Government's written statements, is silent as to whether any protective order the court issues must also be under seal. *See* 18 U.S.C. app. 3, § 4 ("If the court enters an order granting relief following

---

5. The Local Rules of this district require a moving party to "lodge the proposed order with the clerk." Local Rule CR 7(b)(1). When the Court finds no need to alter the contents of a proposed order, it is the practice of this judge to sign the proposed order directly instead of creating one de novo.

such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved [for appeal]"); 18 U.S.C. app. 3, § 6(d) (addressing the sealing of records of *in camera* hearings).

The Court is similarly unaware of any reason why court orders should not be made public because they do not contribute significantly to the functioning of the judicial process. Rather than an isolated statement that does nothing more than grant or deny a motion, an order that explains its rationale enhances public understanding and faith in the fairness of the judicial process. It not only clarifies the result, but explains the legal precedent and policy considerations upon which it is based. The benefits of access to court orders do not accrue merely in those members of the public that read or hear of them. The court itself, knowing that its determinations will be scrutinized by others, is further encouraged to coherently explain the reasoning behind its decision. In short, the general practice of disclosing court orders to the public not only plays a significant role in the judicial process, but is also a fundamental aspect of our country's open administration of justice.

## 2. Rebuttal of the Qualified Right of Access

 Having concluded that the considerations of experience and logic weigh in favor of public access to the Court's three protective orders, it is necessary to consider whether the qualified right of access can be rebutted by the facts of the case. To justify burdening the right of access, the Government must show that the denial of access is "necessitated by a compelling governmental interest and is narrowly tailored to serve that interest." *Globe Newspaper*, 457 U.S. at 607, 102 S.Ct. 2613.

The Ninth Circuit has expanded this general test to a three-part inquiry. To order closure, the court must find that:

> (1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest.

*Oregonian Publ'g*, 920 F.2d at 1466 (citing *Press–Enterprise II*, 478 U.S. at 13–14, 106 S.Ct. 2735).

 Here, the Government contends that continued non-disclosure of the CIPA-related materials is required to protect ongoing compelling interests of national security, particularly in light of the country's informal declaration of war on terrorism following September 11, 2001. The Court's previous Order recognized that safeguarding the national security is a compelling interest. *See* Order of November 29, 2001 (Dkt. No. 330) (citing *Richmond Newspapers*, 448 U.S. at 598 n. 24, 100 S.Ct. 2814 (Brennan, J. and Marshall, J., concurring)); *see also In re Washington Post*, 807 F.2d at 391–92. A compelling interest such as national security, in contrast to the accused's right to a fair trial, is unusual in its ongoing nature and thus does not necessarily dissipate at the end of the trial.

 While the Court agrees with the Government's arguments regarding the harm that will be caused by the disclosure of classified information on national security matters, it declines to completely close the orders. The Government contends that the CIPA-related materials contain pervasive references to the classified information at issue and as a result it is unfeasible to tailor more precisely a judicial

mechanism protecting the information. Upon reviewing the protective orders of February 2, 2001 and March 9, 2001, the Court finds them to be dissimilar to the documents addressed in its previous orders (Dkt. Nos. 328, 330). There, the frequent references to classified information warranted redaction or complete closure. Here, however, the two protective orders contain only general statements about the relevant law, the Court's finding that the underlying documents were properly classified as secret, authorization for the Government to provide the defendant with an unclassified summary to satisfy its discovery obligations, the contents of that summary substitute and the Court's finding that certain information was non-discoverable. The February 2 and March 9 protective orders contain no specific references to the substance of the classified materials. As a result, the Court finds that even a limited redaction would be too restrictive on the public's First Amendment right of access.

 The December 21, 2000 protective order (Dkt. No. 154) is different from the other two in that it does contain a small amount of language describing with specificity certain classified information. This language does not appear in the Government's proposed protective order, but was instead added at the Court's request. The Government now contends that verbatim disclosure of the name of an individual and nine other words would immediately implicate its ability to obtain certain classified information prior to a date specified in the Order and proposes to redact these ten words from the third page of the Protective Order (*See* Dkt. No. 339 at 2, 4.) While this Court has previously recognized the compelling national security interest in the contents of classified information, other courts have characterized the Government's ability to obtain classified information as an integral part of that security interest. *See United States v. Yunis*, 867 F.2d 617, 623 (D.C.Cir.1989). Likewise, the national security interests warranting closure of other pleadings in this case have included the means by which the Government has obtained information. (*See* Order of Nov. 29, 2001 at 3.)

In sum, the Court finds that the Government has a compelling interest in maintaining the secrecy of its intelligence-gathering capabilities and that disclosure of the specified language would harm this interest. It further finds that the proposed redaction of ten words referring to classified information with specificity is the most narrowly tailored means of protecting the Government's compelling interest. Thus, the December 21, 2000 Protective Order, Docket Number 154, will be disclosed to the public only after the name appearing as the first word on page 3, paragraph E, line 12, as well as the remaining eight words on that line and the single word in line 14 are redacted. As redacted, paragraph E should read as follows:

"(E) the government is directed to inform the Court whether its position regarding the . . . information remains the same in . . ."

The Government's Motion to Reconsider or Amend also seeks permission for the Court's Security Officer to declassify the protective orders prior to their disclosure. Without addressing the issue of whether the Court is obligated to give the Government time to declassify documents prior to ordering their disclosure when the documents are subject to the First Amendment right of access, the Court finds this request to be reasonable under the circumstances and worthy of accommodation. Therefore, the Government is directed to declassify the December 21, 2000 protective order, as redacted, and the February

2, 2001 and March 9, 2001 orders, in their entirety, with all practicable speed. Once the protective orders are declassified, the Government is ORDERED to submit them to the Clerk, who is directed to make them available to the public immediately.

### III. CONCLUSION

The CIPA-related materials submitted by the United States are not subject to the public's qualified right of free access under the First Amendment. Therefore, the following documents are to REMAIN SEALED: Docket Numbers 150, 151, 152, 153, 166, 167, 168, 200, 201, and 202. The Court's three protective orders are subject to the public's right of access and shall be UNSEALED following their redaction and declassification as specified above. The protective orders of February 2, 2001 and March 9, 2001 (Docket Numbers 170 and 212) are to be UNSEALED without redaction, and the protective order of December 21, 2000 (Docket Number 154) is to be UNSEALED subject to the redactions specified above.