144 F.3d 1249
 49 Fed. R. Evid. Serv. 740, 98 Cal. Daily Op.
Serv. 4048,
98 Daily Journal D.A.R. 5612
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard KLIMAVICIUS-VILORIA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Oscar CAICEDO-PINEDA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Edilberto FERRARO-MONTESDEOCA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Freddy Queney RIVAS-LERMA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Felix OTERO-ESTUPINAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ruben Dario PALMA-ROBAYO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leoncio Alberto MORCILLO-VIDAL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel PAYAN-SOLIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Arnulfo ROJAS-RENTRIA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dagoberto LERMA-LERMA, Defendant-Appellant.
 Nos. 96-50546, 96-50547, 96-50548, 96-50549, 96-50550,
96-50551, 96-50552, 96-50553, 96-50554, 96-50556.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 2, 1997.
Decided May 29, 1998.
 
 John Dillon Clarke, San Diego, CA, for appellant Klimavicius-Viloria.
 Robert Carriedo, San Diego, CA, for appellant Lerma-Lerma.
 Michael E. Burke, San Diego, CA, for appellant Caicedo-Pineda.
 Daniel Casillas, San Diego, CA, for appellant Ferraro-Montesdeoca.
 D. Wayne Brechtel, Solano Beach, CA, for appellant Rivas-Lerma.
 Inge Brauer, San Diego, CA, for appellant Otero-Estupinan.
 James Matthew Brown, San Diego, CA, for appellant Palma-Robayo.
 Mark A. Chambers, Escondido, CA, for appellant Morcillo-Vidal.
 Douglas C. Brown, San Diego, CA, for appellant Payan-Solis.
 William R. Burgener, San Diego, CA, for appellant Rojas-Rentria.
 William V. Gallo and Gonzalo Curiel, Asst. U.S. Attys, San Diego, CA, for the appellee.
 Appeals from the United States District Court for the Southern District of California; Marilyn L. Huff, District Judge, Presiding.
 Before: FERGUSON, THOMPSON and O'SCANNLAIN, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 On July 28, 1995, the United States Coast Guard seized the vessel Nataly I and the twelve tons of cocaine it was carrying. The Coast Guard arrested the entire crew: Richard Klimavicius-Viloria ("Klimavicius"), master of the ship; Dagoberto Lerma-Lerma, chief engineer; and Oscar Caicedo-Pineda, Edilberto Ferraro-Montesdeoca, Freddy Queney Rivas-Lerma, Felix Otero-Estupinan, Ruben Palma-Robayo, Leoncio Morcillo-Vidal, Daniel Payan-Solis, and Arnulfo Rojas Rentria, collectively the "Crew Members." After a jury trial, Klimavicius, Lerma-Lerma, and all Crew Members were found guilty of possession of cocaine with intent to distribute on board a vessel, 46 U.S.C. app. §§ 1903(a), (c)(1)(C) and (f) (1994). Klimavicius and Lerma-Lerma were also found guilty of conspiracy to possess cocaine with intent to distribute on board a vessel, 46 U.S.C. app. § 1903(j) (1994).
 
 
 2
 Klimavicius, Lerma-Lerma and the Crew Members appeal. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.
 
 FACTS
 
 3
 The Nataly I, a Panamanian-registered vessel, was equipped as a long-line fishing vessel. A long line is a buoyed line five to fifty miles long which is strung with shorter lines holding baited hooks. This type of fishing is used primarily to catch large fish, such as tuna.
 
 
 4
 On June 9, 1995, when Klimavicius arrived to captain the Nataly I, it was being repaired in a secure, closed dock in Panama. The rest of the crew were already on board. With the exception of one three-day trip which Klimavicius made to Cali, Columbia, he and the entire crew stayed on board the Nataly I without interruption. On July 18, 1995, Klimavicius maneuvered the ship through the Panama Canal and out into the ocean.
 
 
 5
 On the morning of July 25, 1995, the U.S.S. Cape St. George, a United States Navy vessel, encountered the Nataly I in international waters near the Galapagos Islands approximately 780 miles off the coast of Peru. The sea near the Galapagos Islands is one of the most prolific fishing areas in the world.
 
 
 6
 Embarked upon the Cape St. George was a U.S. Coast Guard Law Enforcement Detachment. Coast Guard Officer Jose Vizcaino, the boarding officer, hailed the Nataly I via radio, and asked Klimavicius several pre-boarding questions. Klimavicius willingly answered the questions, explaining that the Nataly I was a Panamanian registered vessel, that he and the crew were all Colombians, that the purpose of the voyage was to fish, and that they might be at sea for three months. Klimavicius also gave the Coast Guard permission to board.
 
 
 7
 Once aboard, the Coast Guard boarding team did a preliminary search of the vessel. A test, called the Sherwood spray test, detected the presence of cocaine on one of the access covers in the forward berthing area, where the crew slept. Klimavicius then gave permission to search the three forward tanks. The team also searched a number of other tanks that day, but found no cocaine.
 
 
 8
 During the inspection, the team noticed things that were inconsistent with a fishing voyage. First, there were no fish on board. Klimavicius explained this by stating that the ship had just arrived at the fishing grounds. Second, there were only fifty pounds of squid bait in the fish house, much less than normal for long-line fishing. Third, there was only a small amount of ice in the fish house and the ice was dirty. Fishing vessels use clean ice to preserve the fish. Although there was an ice maker, it was not making enough ice to properly supply the fish house. Finally, the inspection team found an industrial scale, which was of a type not used to weigh fish, because it was not a hanging scale and because a large tuna or swordfish would weigh more than the maximum weight on the scale.
 
 
 9
 The inspection team then left the Nataly I for the night. The Coast Guard contacted the Government of Panama to obtain permission to search the vessel, and if cocaine were found, to arrest the crew and seize the ship. Panama gave permission for the search, but deferred on the question of whether to enforce United States or Panamanian law. During the night, the Nataly I's crew fished for squid bait and caught 400-500 pounds, an amount of bait which would supply one day's long-line fishing.
 
 
 10
 The next morning the Coast Guard team reboarded the Nataly I. When the search resumed, Klimavicius drew a map of the vessel's storage tanks. This revealed that tanks six and seven (where the cocaine was eventually found) were located mid-ship. The access covers for these tanks were concealed by wood planks and several fifty-five gallon drums. Coast Guard Officer David Adcock had previously thought this area suspicious, because it was particularly clean, with soap residue on it. Adcock now inspected the area more closely and noticed that the bolts securing the access covers to these two tanks were shiny and appeared new, indicating that the access plates had been recently removed. In order to inspect the access covers, the planks directly over them had to be removed, as well as several fifty-five gallon drums. Adcock tried to enlist the crew's help in moving the drums. Because he spoke no Spanish, Adcock pointed to the drums and pointed to the place where he wanted them moved. The crew did not respond and looked away from him. At that point, Chief Engineer Lerma-Lerma became very nervous; he wrung his hands and looked like he was about to cry. Crew members Montesdeoca and Morcillo made eye contact, then Montesdeoca shook his head and turned while Morcillo turned around and looked over the side of the boat. The rest of the crew would not look at Adcock.
 
 
 11
 After the access covers were opened, the inspection team found dirty fuel in tank six. Vizcaino asked Klimavicius for permission to transfer the dirty fuel in tank six to the forward tanks, which were empty. Klimavicius objected, claiming that the forward tanks contained clean fuel, which would be contaminated. In fact, those tanks already contained a residue of dirty fuel. Vizcaino ordered the fuel transferred.
 
 
 12
 When requested, Klimavicius produced a portable pump to transfer the fuel. Although Klimavicius claimed there was no other pump on board, there was another pump, which worked after a minor repair.
 
 
 13
 Four Navy engineers were then brought on board to ensure that the fluids were safely transferred among the fifteen tanks. No cocaine was found that day. Because the Government of Panama had given its consent, the Coast Guard took over the Nataly I and left a contingent on board during the night.
 
 
 14
 The cocaine was found the next day. After all the fuel was transferred out of tank six, Coast Guard personnel searched the tank and found a sealed baffle, or partition, and an access plate right behind the baffle wall. When Vizcaino asked Klimavicius about the access plate, Klimavicius said it probably connected tank six to tank eight, because that area was originally one large tank. Vizcaino then asked Lerma-Lerma about the baffle in the tank. Lerma-Lerma appeared to be frightened and responded that "he didn't know, to please stop asking him any more questions about the tanks themselves." Lerma-Lerma was the chief engineer. He was responsible for maintenance of the tanks and should have known their configuration.
 
 
 15
 After the access plate was removed, Vizcaino discovered that the compartment was full of white bales of cocaine. At approximately one o'clock in the afternoon, Vizcaino reported his discovery to Officer David Schoenfeld, the officer in charge of the Coast Guard Law Enforcement Detachment. For safety reasons, Vizcaino decided to divert the crew. He told Lerma-Lerma that he was having problems locating two tanks at the rear of the vessel. Lerma-Lerma's demeanor changed immediately; he became "calm and very helpful." Vizcaino then went to Klimavicius who now appeared nervous; he stared into space and would not make eye contact. When Vizcaino again asked for help with the two rear tanks, Klimavicius relaxed and offered a solution to the problem.
 
 
 16
 The entire Coast Guard team then boarded the Nataly I to help detain the crew. After the fuel was drained from tank seven, the inspection team discovered a similar compartment in that tank, also filled with cocaine.
 
 
 17
 The crew was brought on board the Cape St. George. The Government of Panama was notified and on July 28, it gave permission to seize the Nataly I and the contraband, and arrest the crew under United States law. Vizcaino arrested the crew. The Cape St. George and another Navy ship then towed the Nataly I back to San Diego. The trip took about three weeks, due to a tropical storm and a hurricane.
 
 
 18
 After the Nataly I docked in San Diego, United States Customs inspectors removed and weighed the cocaine. It was then sent to the Drug Enforcement Administration ("DEA") for analysis. The DEA also tested the crew's clothing, but found no trace of cocaine.
 
 
 19
 Klimavicius, Lerma-Lerma, and all Crew Members were convicted of possession of cocaine with intent to distribute on board a vessel. Klimavicius and Lerma-Lerma were also convicted of conspiracy to possess cocaine with intent to distribute on board a vessel. Klimavicius, Lerma-Lerma and the Crew Members appeal their convictions for possession with intent to distribute. Klimavicius and Lerma-Lerma also appeal their conspiracy convictions, and Lerma-Lerma appeals his sentence.
 
 DISCUSSION
 I. The Nexus Requirement
 
 20
 The convictions which are the subject of this appeal stem from violations of the Maritime Drug Law Enforcement Act ("MDLEA"). Under this Act, "[i]t is unlawful for any person on board ... a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally ... possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. app. § 1903(a) (1994).
 
 
 21
 Before a United States court may entertain a prosecution for violation of the Act, "there must be a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair." United States v. Davis, 905 F.2d 245, 248-49 (9th Cir.1990) (citing United States v. Peterson, 812 F.2d 486, 493 (9th Cir.1987)). After a three-day hearing, the district court, not the jury, held that there was sufficient nexus for the United States to maintain jurisdiction. The appellants argue (1) the jury should have decided the nexus issue and (2) the government did not establish a sufficient nexus.
 
 
 22
 A. Who Should Decide Nexus?
 
 
 23
 In a criminal jury trial, the jury must determine every element of the offense. United States v. Gaudin, 515 U.S. 506, 510, 522-23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). At the time of the appellants' trial, jurisdiction was an element of the offenses of which they were convicted.[1]
 
 
 24
 Under 46 U.S.C. app. § 1903(a) (1994), the vessel involved in the alleged criminal conduct must be "subject to the jurisdiction of the United States." The appellants argue that to establish jurisdiction the government must prove nexus--that is, "a connection between the criminal conduct and the United States sufficient to satisfy the United States' pursuit of its interests." United States v. Caicedo, 47 F.3d 370, 372 (9th Cir.1995). Because jurisdiction is dependent upon nexus, the appellants argue, and jurisdiction was an element of the offenses at the relevant time of this case, the jury should have decided the nexus issue.
 
 
 25
 The premise of this argument is that nexus is an element of the offense. To determine whether it is, we first look to the plain meaning of the applicable statute. United States v. Wells, 519 U.S. 482, 117 S.Ct. 921, 927, 137 L.Ed.2d 107 (1997).
 
 
 26
 The statute does not support the argument's premise. The MDLEA contains no nexus requirement. The nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial. We have explained the need for the requirement this way: "A defendant [on a foreign flag ship] would have a legitimate expectation that because he has submitted himself to the laws of one nation [the foreign flag nation], other nations will not be entitled to exercise jurisdiction without some nexus." Caicedo, 47 F.3d at 372.
 
 
 27
 The nexus requirement serves the same purpose as the "minimum contacts" test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who "should reasonably anticipate being haled into court" in this country. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Just as the question of personal jurisdiction should be decided by the court prior to trial, so should the question of nexus, even though it is part of the jurisdictional requirement.
 
 
 28
 Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927), is consistent with this view. In Ford, the Court considered whether a ship carrying liquor during prohibition had been seized within an area prescribed by a treaty between the United States and Great Britain. The Court held that the issue was one of jurisdiction, which should go to the court prior to trial because "[it] did not affect the question of the defendants' guilt or innocence. It only affected the right of the court to hold their persons for trial." Id. at 606, 47 S.Ct. 531.
 
 
 29
 The appellants argue that this court in United States v. Medjuck, 48 F.3d 1107, 1110 (9th Cir.1995), held that the nexus requirement is an element of the offense. This argument misconstrues Medjuck. In Medjuck we held that the government has the burden of proving nexus and that a defendant should have an opportunity to rebut the government's proof. Id. at 1111. We did not require that the jury decide nexus. Our use of terms may have created confusion, however, because we labelled the jurisdiction requirement "statutory" jurisdiction and the nexus requirement "constitutional" jurisdiction. Id. at 1110. In an unrelated case, this led us to incorrectly conflate these two requirements and opine, in dicta, that the jury must determine nexus. United States v. Amparo, 68 F.3d 1222, 1226 (9th Cir.1995) (holding that possession of a sawed off shotgun is a crime of violence), cert. denied, 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 200 (1996). In fact, in all prior cases, the district court has decided the nexus issue. See, e.g., United States v. Khan, 35 F.3d 426, 430 (9th Cir.1994) (conditional guilty plea); Davis, 905 F.2d at 249 (motion to dismiss).
 
 
 30
 We conclude the district court properly considered the nexus issue prior to trial. Nexus is part of the jurisdictional inquiry, but it is an inquiry for the court, not the jury.
 
 
 31
 B. Was There A Sufficient Nexus?
 
 
 32
 There is sufficient nexus "where an attempted transaction is aimed at causing criminal acts within the United States." Davis, 905 F.2d at 249 (quoting Peterson, 812 F.2d at 493). More specifically, there is sufficient nexus where "the plan for shipping the drugs was likely to have effects in the United States." Khan, 35 F.3d at 429.
 
 
 33
 We have found nexus when narcotics were destined for the United States. We have based such a decision upon the location of the vessel when it was seized, Davis, 905 F.2d at 249, and upon testimony about the narcotics' destination, Khan, 35 F.3d at 429-30; United States v. Aikins, 946 F.2d 608, 613-14 (9th Cir.1990). The nature of the United States narcotics market is also relevant in determining nexus. United States v. Wright-Barker, 784 F.2d 161, 169-70 (3rd Cir.1986) (deciding that a ship seized 200 miles from the New Jersey coast was headed for the United States rather than Canada).
 
 
 34
 In the present case, the district court found that the cocaine seized on board the Nataly I was destined for the United States. The court based this determination upon evidence that (1) markings on the cocaine matched the markings on cocaine that had been seized in the United States, (2) the United States was the most likely destination for such a large load of cocaine, and (3) the location of the ship and the kind of navigational maps on board were consistent with the cocaine being bound for the United States.
 
 
 35
 We agree with the district court's assessment of the evidence and its holding. The most persuasive evidence concerns the distinctive markings imprinted onto the bricks of cocaine and printed on the cocaine packages. These same markings are contained within a database the DEA established in 1983 to track cocaine. Thirty to forty countries have contributed to this database.
 
 
 36
 The information in the database showed that the markings on the cocaine seized aboard the Nataly I were identical to markings on cocaine that had been seized predominately in the United States. Five of the markings had been found only on cocaine seized in the United States. The five other markings that the DEA analyzed had been found predominately on cocaine seized in the United States and in countries involved in the shipment of the cocaine, such as Columbia, Panama and Mexico. In each case, there was only one country other than the United States that could have been the destination for the cocaine. Additionally, three sets of the markings have been found together in seizures in the United States.
 
 
 37
 The appellants point out that the database is not complete, because there is no data on cocaine that is not seized, on seizures that are not reported, or on cocaine which has no markings. However, the cumulative weight of the data lends strong support to the district court's conclusion that the drugs were destined for the United States.
 
 
 38
 In addition, twelve tons of cocaine were seized. A DEA analyst testified that the United States is the only country that could absorb such a large shipment. The United States is the largest consumer of cocaine, consuming approximately two-thirds of the world's supply. Even more importantly, the distribution of such a large quantity of cocaine requires an extensive, well-established smuggling system such as is in place in the United States.
 
 
 39
 The appellants argue that the drugs could have been bound for Russia or shipped through Russia to Europe, where cocaine prices are higher than the United States. As the DEA analyst explained, however, this scenario is unlikely. While cocaine consumption in Europe and Russia is on the rise, neither approaches the level of consumption in the United States. Further, the infrastructure in those places is not sophisticated enough to handle such a large shipment.
 
 
 40
 Also of significance is the fact that the Nataly I contained sixty navigational maps, which covered the South American coasts, the eastern Pacific, the southeast Caribbean, Central America, portions of the United States, and Sicily. The fact that there were no navigational maps covering Asia, the western Pacific or the mid-Atlantic supports the conclusion that the cocaine was not destined for Russia or Europe.
 
 
 41
 Finally, the Nataly I's location and its condition are consistent with its use as a mother ship in a scheme to transport cocaine into the United States. The Colombian cartel uses mother ships to transport cocaine out to sea where the cocaine is then loaded onto smaller vessels which land the cocaine, usually into Mexico. The cocaine is then smuggled into the United States. With twelve tons of cocaine on board, the Nataly I was obviously a mother ship. Its location off the Galapagos Islands, when it was ill-equipped for fishing, together with the other circumstances mentioned above, support the district court's conclusion that the cocaine was destined for the United States. This provides a sufficient nexus between the defendants' activities and the United States to satisfy the nexus requirement.
 
 II. Posse Comitatus Act
 
 42
 The appellants moved for dismissal of the indictment or, in the alternative, for suppression of the seized cocaine, on the ground that the Navy's participation in the seizure of the Nataly I violated the Posse Comitatus Act and 10 U.S.C. § 375.
 
 
 43
 The Posse Comitatus Act establishes criminal penalties for use of the Army or Air Force in law enforcement, "unless expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385 (1994). While the Posse Comitatus Act does not itself apply to the Navy, United States v. Roberts, 779 F.2d 565, 567 (9th Cir.1986), Congress has extended the substance of the Act to the Navy by a separate statute, 10 U.S.C. §§ 371-382 (1994 & Supp.1996). This statute provides that no military personnel may directly participate in a civilian "search, seizure, arrest, or other similar activity" unless expressly authorized by law. § 375. This same statute provides that Coast Guard personnel placed on certain Navy ships to seize and arrest vessels smuggling narcotics must be placed there by the Department of Defense. § 379. Additionally, the Department of Defense may provide military personnel to operate equipment to detect, monitor and control sea traffic; to intercept vessels; and to operate equipment to facilitate communication under the MDLEA. § 374(b)(2).
 
 
 44
 In this case, there was a seven-member Coast Guard Law Enforcement Detachment aboard the Navy ship, the Cape St. George. This Coast Guard team boarded the Nataly I and searched the vessel. On the second day of the search, four Navy engineers helped transfer fluids among the fifteen tanks. This had to be done carefully to ensure the stability of the Nataly I. The Navy also transported equipment to assist with the search and showed the Coast Guard personnel how to use the equipment. After the cocaine was found, Navy personnel helped transfer the appellants to the Cape St. George, where Coast Guard personnel arrested, searched and interrogated them. Navy personnel then helped supervise the appellants, gave them medical attention and towed the Nataly I to the United States. Navy personnel did not search the Nataly I nor did they arrest or interrogate the appellants.
 
 
 45
 The Navy's assistance in this case is similar to its assistance in United States v. Khan, 35 F.3d 426, 431-32 (9th Cir.1994). There, the Navy did not violate the applicable Posse Comitatus statutes even though its personnel boarded the ship. Its naval personnel merely provided backup security and logistical support under the Coast Guard's command and did not participate in the search of the ship or the arrest or interrogation of the crew. Id. at 432. In both Khan and this case, the Navy supplied equipment, logistical support and backup security. In addition, although the Navy engineers in the present case moved the fluids among the fifteen tanks, they did so because they had the expertise to perform that operation without endangering the stability of the vessel.
 
 
 46
 We conclude the Navy's assistance was properly indirect and did not violate 10 U.S.C. §§ 371-382 (1994 & Supp.1996).
 
 III. Expert Testimony About Drug Smuggling
 
 47
 The appellants argue that the district court should not have allowed the government to introduce expert testimony by a DEA intelligence research specialist pertaining to maritime drug smuggling. They contend this evidence should have been excluded as impermissible drug courier profile evidence. We disagree.
 
 
 48
 A drug courier profile is "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). Drug courier profile evidence is extremely prejudicial and may be used only in limited circumstances, such as "to establish modus operandi ... in exceptional, complex cases." United States v. Lim, 984 F.2d 331, 335 (9th Cir.1993). This is such a case. The DEA intelligence research specialist's testimony "was necessary to inform the jury of the techniques employed by drug dealers in their illegal trade, techniques with which an ordinary juror would most probably be unfamiliar." United States v. Figueroa-Lopez, 125 F.3d 1241, 1245 (9th Cir.1997).
 
 
 49
 The specialist testified about fifteen different smuggling routes over air, land and sea, and gave a detailed explanation of the complexity of maritime smuggling. She related how mother ships, which may be disguised as fishing vessels, take circuitous routes to their destinations to avoid detection. She also explained that drug trafficking organizations are compartmentalized, in that different groups are responsible for different functions, so that each group has limited knowledge of the operation.
 
 
 50
 We conclude the district court did not abuse its discretion in admitting the DEA specialist's testimony describing maritime drug smuggling. The evidence was admissible to establish modus operandi.
 
 IV. Admission of Sherwood Drug Spray Test
 
 51
 The appellants argue that the district court erred by admitting evidence of the Sherwood spray test because the court did so without a hearing, which they contend is required by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). They also contend the test results focused on evidence of other bad acts.
 
 
 52
 The Sherwood Spray Test is used to detect cocaine. Coast Guard Officers Schoenfeld and Vizcaino each described the test and its use aboard the Nataly I. When asked if any drugs were found on the first day of the search, Schoenfeld and Vizcaino testified that the Sherwood test results were positive for cocaine but that no cocaine was found. On cross-examination, the Crew Members established that the officers were not familiar with the test's reliability and were not trained in its use. The cross-examination also brought out that the test merely found trace amounts of cocaine and that no cocaine was actually found in the area which tested positive.
 
 
 53
 The test was offered to help explain the actions that the Coast Guard took when it boarded the Nataly I. No Daubert hearing was required because the test was not offered as scientific evidence to prove the presence of cocaine. That was not necessary. Twelve tons of cocaine were found on the vessel.
 
 
 54
 Nor was the evidence excludable as evidence of other bad acts. The appellants argue the test results constituted prejudicial evidence of personal use of cocaine, because the results showed the presence of cocaine in the berthing area. This argument lacks merit. No cocaine was found in the berthing area. Moreover, no trace of cocaine was found on any of the appellants' clothing. There simply was no "other bad acts" evidence.
 
 
 55
 The district court did not abuse its discretion in admitting the evidence of the Sherwood spray test and its results.
 
 V. Confidential Documents
 
 56
 The district court granted the government's motions for protective orders under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 (1994), and Federal Rule of Criminal Procedure 16(d)(1). The appellants moved for a mistrial, arguing (1) the district court did not follow the procedures set forth in CIPA; (2) confidential informant and relevant surveillance information was contained within the material and should have been disclosed; and (3) the district court's use of ex parte, in camera hearings improperly prejudiced the court against the appellants.
 
 
 57
 CIPA creates a pretrial procedure for ruling upon the admissibility of classified information. United States v. Sarkissian, 841 F.2d 959, 965 (9th Cir.1988). When the government seeks to protect classified information, sections 3 and 4 of CIPA are relevant. United States v. Pringle, 751 F.2d 419, 427 (1st Cir.1984). Section 4 provides in relevant part:
 
 
 58
 The court may permit the United States to make a written request for [an authorization to delete specified items in discoverable documents] in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.
 
 
 59
 18 U.S.C. app. 3, § 4 (1994).
 
 
 60
 The appellants argue the material was not properly classified and the government did not follow the procedures required under CIPA.
 
 
 61
 In order to show that material is classified, the government must make a formal claim of state secret privilege. Sarkissian, 841 F.2d at 966. This formal claim must "be lodged by the head of the department which has actual control over the matter, after actual personal consideration by that officer." United States v. Reynolds, 345 U.S. 1, 7-8, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (footnotes omitted). We have examined the government's sealed submissions and conclude they satisfy Reynolds.
 
 
 62
 The appellants also argue that although CIPA provides that the district court may conduct an ex parte, in camera review of written material, it may not hold the ex parte, in camera hearings it held in this case. Government counsel was present at these hearings; defense counsel was not.
 
 
 63
 The appellants base their argument on the text of CIPA and Rule 16, both of which refer to "a written statement to be inspected by the court [/judge] alone." CIPA § 4, 18 U.S.C. app. 3 § 4; Fed R.Crim. P. 16(d)(1) (emphasis added). No mention is made in CIPA or Rule 16 about a hearing in which counsel participate.
 
 
 64
 Ex parte hearings are generally disfavored. See, e.g., United States v. Kenney, 911 F.2d 315, 321 (9th Cir.1990). In a case involving classified documents, however, ex parte, in camera hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information. See United States v. Yunis, 867 F.2d 617, 620 (D.C.Cir.1989) (holding an ex parte, in camera hearing in which the government explained the specific damage to national defense if information were disclosed). Such a hearing is appropriate if the court has questions about the confidential nature of the information or its relevancy. Further, while these statutes specify written submissions, they do not rule out hearings in which government counsel participate. The district court did not err in holding the hearings.
 
 
 65
 The appellants next argue that the district court should have disclosed information about confidential informants and surveillance contained in the material that the court reviewed during the ex parte, in camera hearings. We disagree.
 
 
 66
 In order to determine whether the government must disclose classified information, the court must determine whether the information is "relevant and helpful to the defense of an accused." Yunis, 867 F.2d at 623 (quoting Roviaro v. United States, 353 U.S. 53, 60-61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)); see also Pringle, 751 F.2d at 428; cf. Sarkissian, 841 F.2d at 965 (the court can engage in balancing). Under this test, information meets the standard for disclosure "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). We have reviewed the classified material and agree with the district court that the information it contains is not helpful to the defense. The information fails to meet the standard for disclosure.
 
 
 67
 The appellants also contend the ex parte hearings were prejudicial (1) because the appellants were not aware of the nature of the information discussed at the hearings and were unlawfully denied their right to be present during every stage of the trial, and (2) because the information may have prejudiced the trial court judge. Again, we disagree.
 
 
 68
 Congress intended CIPA to clarify the court's power to restrict discovery of classified information. Sarkissian, 841 F.2d at 965. The legislative history explains that because "the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules." Id. (quoting H.R. Rep. 96-831(II), 27 n.22 (1980)).
 
 
 69
 Moreover, an ex parte hearing does not violate a defendant's right to be present at all stages of a trial. "A defendant need not be present ... when the proceeding involves only a conference or hearing upon a question of law." Fed.R.Crim.P. 43(c)(3). The question of whether to protect classified information under CIPA is a question of law within the meaning of Rule 43. Cf. United States v. Veatch, 674 F.2d 1217, 1225-26 (9th Cir.1981) (defendant's absence from conference to decide defendant's competency to stand trial and a motion in limine did not violate due process or Rule 43 because defendant could not contribute to discussion of questions of law).
 
 
 70
 Finally, we have examined the record and, although the classified material contains information which cuts against the appellants' position, there is nothing to support the appellants' contention that the material prejudiced the district court judge.
 
 VI. Juror and Prosecutorial Misconduct
 
 71
 The appellants contend the district court erred in failing to grant their motion for a mistrial or, in the alternative, a new trial due to a newspaper article that appeared in the local press during jury deliberations. They claim both juror and prosecutorial misconduct.
 
 
 72
 Jury deliberations began on a Friday. On Sunday, the local newspaper published an article entitled Colombian Held in Wake of '95 Drug Haul with San Diego Link. The article discusses the arrest of Jose Castrillon, the alleged owner of the Nataly I. The article begins by referring to the seizure of cocaine on the Nataly I and the arrest of the crew. It then links Castrillon to the Cali cartel. In the middle of the fourteen paragraph article, it reports Errol Chavez, Special Agent in charge of the San Diego office of the DEA, as saying that "the information developed in San Diego played a major role in the arrest." The penultimate paragraph reads: "Chavez said he had not been involved in the interrogation of the 10 crew members of the Nataly I and could not say whether they had shed much light on Castrillon."
 
 
 73
 The news reporter's investigation was prompted in part by an article that appeared in a Panamanian newspaper. The day the Panamanian news article appeared, the reporter called the prosecution to ask for comments regarding any connection between the Nataly I and the Castrillon arrest. The prosecution refused to comment because of the ongoing jury deliberations. Although the prosecution had previously told the DEA and all the other government agencies involved in this case not to communicate with the press, the prosecution failed specifically to instruct the DEA not to discuss the Castrillon arrest.
 
 
 74
 The prosecution brought the newspaper article to the district court's attention before the jury began its deliberations on Monday. The district court denied the defense motion for a mistrial and called in the jury. The court chose not to mention the article to the jury. Instead, the court carefully instructed the jury on what they could and could not consider as evidence, and specifically instructed the jury not to pay attention to newspaper accounts.
 
 
 75
 After the trial was over, the district court polled each of the jurors. Six of the jurors had seen the article; four jurors had read it. The jurors did not discuss the substance of the article in the jury room, although one juror mentioned to a fellow juror that there was an article relating to the case. All jurors reported that the article had not influenced their decision.
 
 A. Juror Misconduct
 
 76
 A trial court should grant a new trial "when the jury obtains or uses evidence that has not been introduced during trial if there is a reasonable possibility that the extrinsic material could have affected the verdict." United States v. Hernandez-Escarsega, 886 F.2d 1560, 1580 (9th Cir.1989) (internal quotations, citations and emphasis omitted). We have found reversible error when there is a "direct and rational connection between the extrinsic material and a prejudicial jury conclusion, as distinguished from a connection that arises only by irrational reasoning." United States v. Bagnariol, 665 F.2d 877, 885 (9th Cir.1981) (whether a nonexistent company was listed in business publications is not rationally related to whether defendants believed the company was a front).
 
 
 77
 Here, the appellants argue that the newspaper article was prejudicial because the jury could have used it to decide that the appellants knew about the cocaine on the Nataly I.[2] To make that inference, the jurors would have had to believe that Chavez's statement (that he could not say whether the crew members had shed much light on Castrillon), combined with the statement that information developed in San Diego led to Castrillon's arrest, implied that the appellants provided information which led to Castrillon's arrest.
 
 
 78
 Such a conclusion does not follow. The fact that the appellants were interrogated does not mean that they provided information, or that they knew anything about the cocaine on board the Nataly I. The statement in the newspaper article does not support the appellants' claim of juror misconduct.
 
 B. Prosecutorial Misconduct
 
 79
 The appellants contend that DEA Agent Chavez's statement as reported in the newspaper article constituted prosecutorial misconduct. We disagree.
 
 
 80
 As discussed above, Chavez's statement did not provide a basis for any inference against the appellants as to their knowledge of cocaine aboard the vessel. Further, the court instructed the jury not to consider newspaper articles, and the jury did not discuss the content of the article. Most importantly, the prosecution had nothing to do with publication of the newspaper article. Cf. United States v. Coast of Maine Lobster Co., 538 F.2d 899, 901-02 (1st Cir.1976) (prosecutor controlled the timing and content of a televised interview and newspaper article which appeared during trial). There was no prosecutorial misconduct.
 
 VII. Sufficiency of the Evidence
 
 81
 The appellants were convicted of possessing cocaine with intent to distribute. The Crew Members and Lerma-Lerma argue that the evidence is insufficient to establish their knowing participation in the illegal venture or their intent to distribute the cocaine. Additionally, Lerma-Lerma argues the evidence is insufficient to support his conspiracy conviction.
 
 A. Possession with Intent to Distribute
 
 82
 A conviction for possession of a controlled substance with intent to distribute may be based on aider and abettor liability. United States v. Sanchez-Mata, 925 F.2d 1166, 1168-69 (9th Cir.1991). To aid and abet, "it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); see Sanchez-Mata, 925 F.2d at 1169. The government must show more than mere participation; the defendant must "intentionally assist[ ] in the venture's illegal purpose." United States v. Vasquez-Chan, 978 F.2d 546, 552 (9th Cir.1992) (quoting United States v. Disla, 805 F.2d 1340, 1352 (9th Cir.1986)) (quoting United States v. Groomer, 596 F.2d 356, 358 (9th Cir.1979)).
 
 
 83
 In this case, there must be sufficient evidence of knowing participation. There need not be evidence of specific intent to distribute because that intent can be inferred from the large quantity of cocaine--twelve tons. United States v. Humphrey, 759 F.2d 743, 751 (9th Cir.1985).
 
 
 84
 Knowing participation may be shown by a number of factors, which include:
 
 
 85
 a long voyage on a small vessel evincing a close relationship between captain and crew; suspicious behavior or diversionary maneuvers before apprehension; attempts to flee; inculpatory statements made after apprehension; witnessed participation as a crewman; obviousness of the contraband; or absence of equipment necessary to the intended use of the vessel.
 
 
 86
 United States v. Ospina, 823 F.2d 429, 433 (11th Cir.1987) (quoting United States v. Vidal-Hungria, 794 F.2d 1503, 1515 (11th Cir.1986)) (relying upon United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir.1985)); see also United States v. Robinson, 843 F.2d 1, 8-9 (1st Cir.1988) (whether vessel had a legitimate purpose). The factors that are relevant in this case include the absence of properly working fishing equipment, the crew's demeanor, and the circumstances of the cocaine's concealment.
 
 
 87
 Courts have found evidence of knowing participation when a ship's asserted legitimate purpose appears to be a ruse. Courts look to whether the vessel's equipment is properly working to determine if the vessel's purpose was legitimate. Compare United States v. Sandoval, 787 F.Supp. 275, 280 (D.P.R.1992) (vessel supposedly being delivered for sale, but ship not in marketable condition), with Vidal-Hungria, 794 F.2d at 1516 (evidence insufficient where cargo ship contained legitimate cargo and marijuana hidden in a tightly sealed compartment). Fishing vessels that are not properly equipped for fishing fall into this category. United States v. Gonzalez-Torres, 779 F.2d 626, 627-28 (11th Cir.1986) (lobster boat carried only a line and some floats and was not in a fishing area).
 
 
 88
 Here, the government presented evidence that long-line fishing was merely a ruse because (1) the Nataly I was not properly equipped for fishing, (2) there was equipment on board that was useful for smuggling cocaine, but not fishing, and (3) the Crew Members were not fishing when the Coast Guard boarded the vessel.
 
 
 89
 When the Coast Guard personnel inspected the long line after the appellants had been arrested, they found that the long line was inoperable. The two hydraulic spools that operate the long line were not working. The spools were rusty and not properly maintained. There were also broken hydraulic lines and a broken fitting. The manual hand reel, which could also operate the long line, was not working because the gears were stripped.[3] Additionally, although sharp knives are essential to gut fish, the Customs inspectors found only five rusty knives on board the Nataly I when it docked in San Diego.[4]
 
 
 90
 The appellants' expert, a commercial fisherman with twenty-five years of experience who had been on twenty long-line fishing vessels, opined that the Nataly I was in fact capable of long-line fishing. Although the equipment was not up to United States standards, in his opinion it was in average condition for a vessel from a third world country. He testified that the main line and bait-out tables were of very good quality. He admitted, however, that there were only a small number of buoys and that because he was not able to fire up the system that operated the long line, he did not know if it actually worked.
 
 
 91
 In contrast to the deteriorated condition of the fishing gear, the navigation equipment on the Nataly I was first rate and in good condition. This contrast is significant: there was equipment on board consistent with a smuggling operation, but not consistent with a legitimate fishing trip. The Nataly I had equipment on board to allow one person to breathe safely while inside the fuel tanks; there was a diving mask, a scuba regulator, some air hose, explosion proof drop lights, and an electric portable air compressor. But there were no wet suits, scuba tanks or other equipment used by scuba divers. There was an industrial scale, which could have been used to weigh the cocaine, but which was not suitable for weighing the large fish the vessel supposedly was on a voyage to catch. There was twine on board identical to the twine used to tie up the cocaine. The twine was hung on the wall near tank seven where part of the cocaine was found.
 
 
 92
 The actions of the crew were also significant. The Crew Members did not appear to be fishing. When the Coast Guard initially boarded the Nataly I, there was only a small amount of squid bait, not enough for one day's fishing. The crew did not begin to seriously fish for bait until the evening after the Coast Guard boarded the ship. There are two possible explanations for this. Either the Nataly I had just arrived at the fishing grounds (as appellant Klimavicius explained), or the crew began to fish only because the Coast Guard showed up. Additionally, there was only a small amount of ice in the fish house, and it was dirty. To properly preserve fish, it must be packed in clean ice. There was an ice maker aboard, but it was not making enough ice to pack the fish.
 
 
 93
 Although it is true that, unlike the ship in Gonzalez-Torres, the Nataly I was seized in one of the best long-line fishing areas of the world, the DEA intelligence analyst explained that mother ships, which are often disguised as fishing vessels, will go to a fishing area like the Galapagos Islands to blend in with legitimate fishing vessels. In sum, the jury could have found that the Nataly I was not really engaged in long-line fishing.
 
 
 94
 Another factor the jury could consider is whether the crew was cooperative, because diversionary tactics may indicate evidence of knowledge. United States v. Garate-Vergara, 942 F.2d 1543 (11th Cir.1991) (dumping duffle bags of cocaine overboard); Sandoval, 787 F.Supp. 275 (changing course after initial encounter and not answering radio messages). Here, the crew initially could be viewed as cooperative. However, when the Coast Guard decided to search tank six (where bales of cocaine were first discovered), the crew became decidedly less cooperative. Klimavicius objected to transferring the fuel from tanks six and seven to the forward tanks. Lerma-Lerma claimed he did not know about the configuration of the tanks, even though as chief engineer he should have. Finally, Officer Adcock, who did not speak Spanish, used gestures to request that the crew move the fifty-five gallon drums which covered the access covers to tanks six and seven and the crew ignored him. From this evidence, the jury could have found that the crew was cooperative only up to the point at which the Coast Guard started getting close to the cocaine.
 
 
 95
 Finally, the government presented evidence from which it could be inferred that the crew was present when the cocaine was loaded on board the Nataly I. Courts have found that a crew had sufficient knowledge of narcotics aboard a ship when there were signs that the hold where the narcotics were located had been recently sealed or camouflaged. Garate-Vergara, 942 F.2d at 1548 (finding sufficient evidence as to those crew members with paint on their clothes, when hold containing narcotics had been freshly painted and sealed); Gonzalez-Torres, 779 F.2d at 628 (strong smell of fiberglass resin implied that hold recently sealed). Here, the deck above the access covers to tanks six and seven had been recently washed and the bolts securing the access covers were new, unlike the surrounding bolts, which were rusty. The condition of the covers and bolts supports an inference that someone had recently entered tanks six and seven, the tanks where the cocaine was hidden. Entry into the tanks was unnecessary to fill them with fluids or to empty them. Additionally, all of the crew were on board the Nataly I by June 9, even though the ship did not begin its voyage until July 18. It is unlikely twelve tons of cocaine would have been loaded onto the Nataly I before the crew was on board, because that would have meant the cocaine was on board more than a month prior to the voyage. Loading the cocaine so far in advance of the voyage by persons other than the crew who remained aboard the ship would have significantly increased the risk of discovery before the ship put to sea.
 
 
 96
 On the other hand, no trace of cocaine was found on the crew's clothing, which might imply that the crew had not participated in loading or handling the twelve tons of cocaine. However, the cocaine was wrapped in so many layers of tape and bags that the outer bags themselves were free of any cocaine residue. For this reason, the DEA analyst who analyzed the cocaine and the clothing was not surprised that there was no cocaine residue on the crew's clothes.
 
 
 97
 Viewing the evidence in the light most favorable to the government, as we must, a jury could find beyond a reasonable doubt that the appellants knowingly participated in the smuggling operation. There was ample evidence that they knew the ship was loaded with cocaine, and that they participated in the vessel's operation, thus enabling the venture to be carried out. Their knowing participation is also indicated by the huge amount of cocaine on board. It is highly unlikely anyone would entrust this cargo of cocaine with a wholesale value of $144 million to a crew "who w[ere] not to be trusted completely with knowledge of its criminal character." United States v. Humphrey, 759 F.2d 743, 751 (9th Cir.1985) (quoting United States v. Allen, 675 F.2d 1373, 1384 (9th Cir.1980)).
 
 B. Conspiracy Count
 
 98
 Lerma-Lerma contends there is insufficient evidence to support his conviction for conspiracy to possess cocaine with intent to distribute on board a vessel. While Lerma-Lerma admits that there was sufficient evidence of a conspiracy, he argues that the evidence was insufficient to show he knew of the conspiracy or acted in furtherance of it.
 
 
 99
 "Once a conspiracy exists, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict defendant of knowing participation in the conspiracy." United States v. Penagos, 823 F.2d 346, 348 (9th Cir.1987).
 
 
 100
 Lerma-Lerma occupied a special position on the Nataly I. He was the chief engineer. As such, he would likely know what was in the fuel tanks for which he was responsible. See Robinson, 843 F.2d at 9. Because Lerma-Lerma was responsible for maintaining the tanks, the jury could infer he knew something about the different configuration of tanks six and seven. Yet, when asked about tank six, he professed ignorance.
 
 
 101
 Even more telling, however, was the marked change in Lerma-Lerma's demeanor. Gonzalez-Torres, 779 F.2d at 627 (finding knowledge where crew member, who had been sitting quietly, began to act nervous and anxious when the investigator began to inspect the sealed hold). As the search progressed and especially after the search team decided to search tank six, Lerma-Lerma became visibly nervous. In fact, he began to cry. When Officer Vizcaino diverted the search and appeared to want to search some water tanks, Lerma-Lerma visibly relaxed.
 
 
 102
 The evidence also established that Lerma-Lerma acted in furtherance of the conspiracy. His expertise as the chief engineer was essential to the successful operation of the vessel. The criminal venture could not succeed without his assistance.
 
 
 103
 The evidence was sufficient to support Lerma-Lerma's conviction on the conspiracy count.
 
 VIII. Sentencing
 
 104
 Lerma-Lerma argues that the district court erred in not granting his requests for downward departures and adjustments. He argues he should have received a two-level downward adjustment for acceptance of responsibility under United States Sentencing Guidelines Manual ("USSG") § 3E1.1 (Nov.1995); a two-level downward adjustment for playing a minor role under USSG § 3B1.2 and USSG § 2D.1.1, comment (n.14); and a two-level downward departure for family responsibilities under USSG § 5H1.6.
 
 
 105
 The district court granted Lerma-Lerma no adjustments or departures from the guidelines and imposed a twenty-year sentence, which was near the low end of the sentencing range. In contrast, the district court granted the Crew Members downward adjustments and departures. The Crew Members received at most ten-year sentences.
 
 A. Acceptance of Responsibility
 
 106
 Lerma-Lerma argues he should have received a two-level downward adjustment for acceptance of responsibility because he went to trial only to preserve the nexus issue, which did not relate to factual guilt.
 
 
 107
 The Sentencing Guidelines allow an adjustment in the "rare situations" where a defendant goes to trial to preserve issues which do not relate to factual guilt. USSG § 3E1.1, comment (n.2). "In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pretrial statements and conduct." Id.
 
 
 108
 The adjustment Lerma-Lerma seeks is unwarranted in this case. He remained silent and made no statements, either before or after the trial. Moreover, he did not object to the probation officer's recommendation in the Presentence Report against a downward adjustment for acceptance of responsibility, nor did he object to the district court's denial of such an adjustment during his sentencing hearing. Consequently, the issue is waived. United States v. Manarite, 44 F.3d 1407, 1419 n. 18 (9th Cir.1995).
 
 B. Minor Participant Role
 
 109
 Lerma-Lerma also contends he should have received a downward adjustment under both USSG § 3B1.2 and USSG § 2D1.1, comments (n.14). Both of these sections require that the defendant be a minor participant.
 
 
 110
 A defendant is entitled to a two-level reduction as a minor participant only if he is "less culpable than most other participants, but [his] role could not be described as minimal." USSG § 3B1.2(b), comment (n.3). The relevant comparison is between the defendant's conduct and that of the other participants in the same offense. United States v. Benitez, 34 F.3d 1489, 1498 (9th Cir.1994). Further, to merit a reduction the defendant must be "substantially" less culpable. Id.
 
 
 111
 Lerma-Lerma's argument is based on the fact that he was denied the downward adjustment which the district court gave to the other crew members. The district court denied Lerma-Lerma a minor role adjustment because the court was "convinced that he's guilty and that he played a greater role than he's leading the court to believe at this point." This makes sense. As the Chief Engineer, Lerma-Lerma supervised three crew members and had primary responsibility for the maintenance of the Nataly I. As we have previously stated, he fulfilled a critical role in the criminal venture. The court did not clearly err in denying Lerma-Lerma a minor role downward adjustment.
 
 
 112
 Lerma-Lerma argues that an upward adjustment for an enhanced role based on his special skills as Chief Engineer was improper. United States v. Harper, 33 F.3d 1143, 1151 (9th Cir.1994). This is correct, but irrelevant because Lerma-Lerma did not receive such an upward adjustment.
 
 C. Family Responsibilities
 
 113
 Finally, Lerma-Lerma contends that before denying his request for a downward departure under USSG § 5H1.6, the district court should have considered whether such a departure was encouraged or discouraged by the guidelines. Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996). On its face, section 5H1.6 discourages a departure: "Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." USSG § 5H1.6 (emphasis added). When a special factor is discouraged, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon, 116 S.Ct. at 2045.
 
 
 114
 Although the court did not specifically discuss this factor, it did state concerning all of Lerma-Lerma requests: "I've considered them, and I've exercised the Court's discretion, and the Court declines to depart." This was sufficient.
 
 
 115
 AFFIRMED.
 
 FERGUSON, Circuit Judge, dissenting:
 
 116
 I dissent because the evidence was insufficient to convict the rank and file crew members of possession with intent to distribute. In addition, the jury's consideration of the newspaper article demands a new trial.
 
 
 117
 I. Insufficient Evidence of the Crew Members' Knowledge.
 
 
 118
 Even viewing all of the evidence in the government's favor, a rational trier of fact could not have found the rank and file crew members guilty beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Possession of narcotics with intent to distribute may be based on one of three legal theories: (1) co-conspirator liability; (2) aiding and abetting; or (3) the exercise of dominion and control over the contraband. United States v. Ramos-Rascon, 8 F.3d 704, 711 (9th Cir.1993); United States v. Sanchez-Mata, 925 F.2d 1166, 1168 (9th Cir.1991). The government never attempted to prove co-conspirator liability and failed to present sufficient evidence to support the other two theories.
 
 
 119
 A. Dominion and Control.
 
 
 120
 The government bore the burden of proving that the crew members (1) knowingly, (2) possessed the cocaine, (3) with an intent to distribute it. United States v. Ocampo, 937 F.2d 485, 488 (9th Cir.1991). Although possession of a large quantity of cocaine alone may be sufficient to infer both knowledge and intent to distribute, the inferences depend on proof of possession--i.e. dominion and control. Id. at 488-489. "Mere proximity to contraband, presence on property where it is found, and association with a person or persons having control of it are insufficient to establish possession." Sanchez-Mata, 925 F.2d at 1169; United States v. Savinovich, 845 F.2d 834, 837 (9th Cir.1988); United States v. Disla, 805 F.2d 1340, 1351 (9th Cir.1986). "A defendant who constructively possesses narcotics has the ability to assure their production, without difficulty, to a customer." Ramos-Rascon, 8 F.3d at 712 (quoting Disla, 805 F.2d at 1352 and United States v. Batimana, 623 F.2d 1366, 1369 (9th Cir.1980)).
 
 
 121
 Thus, other circuits have consistently found that the mere presence of a large bulk of contraband on a ship will not establish the crew members' knowledge of the contraband. See United States v. Garate-Vergara, 942 F.2d 1543, 1549 (11th Cir.1991); United States v. Vidal-Hungria, 794 F.2d 1503, 1514-1515 (11th Cir.1986); United States v. Bland, 653 F.2d 989, 997 (5th Cir.1981); United States v. Willis, 639 F.2d 1335, 1339 (5th Cir.1981). Rather, as the majority concedes, additional evidence is needed to support conviction. Such evidence might include: suspicious behavior or diversionary tactics, inculpatory statements, obviousness of contraband, absence of equipment necessary for the intended use of the vessel, and a long voyage on a small vessel with a close relationship between captain and crew. See Vidal-Hungria, 794 F.2d at 1515 (citing United States v. Cruz-Valdez, 773 F.2d 1541 (11th Cir.1985)); United States v. Robinson, 843 F.2d 1, 8 (1st Cir.1988).
 
 
 122
 First, I disagree with the majority that the facts of this case support a finding that the rank and file crew members knowingly participated in drug trafficking. The cocaine was hidden inside a secret compartment in two of the ship's fuel tanks. The cocaine was so well hidden that it took the Coast Guard three days to find it. Unlike the ship's captain and the chief engineer, the rank and file crew members had no reason to know the configuration or contents of the fuel tanks. The parties stipulated that the weight of cocaine in lieu of fuel caused no noticeable difference in the depth at which the ship rode in the water or in the amount of time it took the ship to roll from side to side. Despite extensive government testing, no traces of cocaine were found on the crew members' clothes or belongings. The lack of the DEA agent's "surprise" at these test results does not qualify as expert opinion and cannot be considered evidence. Finally, the fact that certain crew members exchanged glances, shook their heads, or gave looks of resignation is understandable given that they had been confined and under surveillance by armed, foreign authorities for three days.
 
 
 123
 Secondly, and more importantly, I dissent because the majority has stretched the "suspicious behavior/diversionary tactics" factor beyond recognizable bounds. Contrary to the majority's suggestion, United States v. Garate-Vergara, 942 F.2d 1543 (11th Cir.1991), does not stand for the proposition that lack of cooperation can be used against criminal defendants. In that case, crew members actively tried to hamper the authorities' investigation by throwing duffel bags containing cocaine overboard. Id. at 1546. Tellingly, even this evidence was insufficient to convict all of the crew members. Id. at 1549-50. Similarly, in United States v. Sandoval, 787 F.Supp. 275 (D.Puerto Rico 1992), although the court cited the crew's failure to respond to radio or loud hailer communications (transmitted in both Spanish and English), it did so in connection with noting that the defendants had changed course and attempted to evade the authorities. Thus, the cases relied on by the majority involved affirmative, evasive action. We must keep in mind Justice Cardozo's observation that a principle tends to "expand itself to the limit of its logic." If the crew member's alleged "lack of cooperation" can be used against them, why not a refusal to confess? The majority has set new and dangerous precedent.
 
 
 124
 Moreover, the fact that crew members did not respond to a request made in a foreign language can hardly be deemed lack of cooperation. Viewing the evidence in the government's favor, the most that can be inferred is that the crew knew that they were not on a fishing trip. There is still no particularized evidence indicating that the crew knew that the ship contained cocaine, that they exercised dominion and control over the cocaine, or that they intended to distribute the cocaine.
 
 
 125
 B. Aiding and Abetting.
 
 
 126
 Aiding and abetting liability requires that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." Sanchez-Mata, 925 F.2d at 1169 (quoting Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949)). "Mere participation in a criminal venture is not enough; the government must also show that the defendant intentionally assisted in the venture's illegal purpose." Ramos-Rascon, 8 F.3d at 711 (quoting United States v. Vasquez-Chan, 978 F.2d 546, 552 (9th Cir.1992) and United States v. Disla, 805 F.2d 1340, 1352 (9th Cir.1986)).
 
 
 127
 As with possession, the mere presence of a large quantity of narcotics on the vessel is insufficient to establish a crew members' knowledge of the contraband in an aiding and abetting case. See United States v. Steuben, 850 F.2d 859, 869 (1st Cir.1988). Because the government has failed to present sufficient evidence that the crew members were aware of the presence of cocaine on board the Nataly I, see Section I.A. supra, no rational juror could convict them of aiding and abetting the distribution of the cocaine. The crew members' convictions should therefore be overturned.
 
 
 128
 II. The Newspaper Article.
 
 
 129
 Jury deliberations began on Friday. That Sunday, the San Diego Union Tribune published an article entitled Colombian held in wake of '95 drug haul with San Diego link. The article opens by stating that "[w]hen the U.S. Navy and Coast Guard seized a record 12 tons of cocaine last summer aboard a Panamanian fishing vessel that was later towed to San Diego, the only people taken into custody were the boat's ten crew members." The article then reports the arrest in Panama of Jose Castrillon, the owner of the Nataly I, for exporting cocaine into the United States and Europe. The article next describes the search of the Nataly I and the crew members' arrest and states that "[i]nformation developed in San Diego played a major role in the arrest of Castrillon." The article then links Castrillon to the Cali cartel, describes U.S. efforts to indict him, and quotes a special agent in charge of the San Diego DEA office as saying that "he had not been involved in the interrogation of the 10 crew members of the Nataly I and could not say whether they had shed much light on Castrillon."
 
 
 130
 The article was brought to the district court's attention on Monday morning before jury deliberations began. The trial court denied defendants' motion for mistrial and called in the jury. Rather than discuss the article, the trial court instructed the jury that "anything you may have seen or heard when the court was not in session is not in evidence. That would include any outside activities. Remember, the Court instructed you to not pay attention to any press, media, newspaper accounts."
 
 
 131
 After the trial, the court polled the jurors to determine whether they had seen the article. Four jurors had read the article, one read the headline, another saved the article to read after the trial, and six had not seen the article at all. The trial court's questioning also revealed that, during deliberations, one juror mentioned that an article concerning the case had been printed in the Sunday paper, but did not discuss the substance of the article.
 
 
 132
 A. Juror Misconduct.
 
 
 133
 Jury exposure to news articles regarding the case may deprive defendants of their Sixth Amendment rights to confrontation, cross-examination and assistance of counsel. Lawson v. Borg, 60 F.3d 608, 612 (9th Cir.1995) (citing Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir.1988)). Defendants are entitled to a new trial if there is a "reasonable possibility that the extrinsic material could have affected the verdict." Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir.1987) (quoting United States v. Vasquez, 597 F.2d 192, 193 (9th Cir.1979)) (emphasis in original). This is generally true where the outside material relates to a material aspect of the case and there exists a direct and rational connection between it and the prejudicial jury conclusion. United States v. Bagnariol, 665 F.2d 877, 885 (9th Cir.1981).
 
 
 134
 In the present case, the agent in charge of the DEA office stated that he did not know whether the crew members shed "much" light on Castrillon. This implies that the crew did shed some light on Castrillon. The further depiction of Castrillon as a major link in the Cali Cartel would logically lead jurors to believe that, if the crew had provided information leading to his arrest, they must also have known that he was a trafficker. This directly relates to the pivotal issue of the crew members' knowledge of the existence of cocaine on the Nataly I.
 
 
 135
 The government has failed to show that this error was harmless beyond a reasonable doubt. See, e.g., Hughes v. Borg, 898 F.2d 695, 700 (9th Cir.1990); United States v. Caro-Quintero, 769 F.Supp. 1564, 1573 (C.D.Cal.1991). As discussed above, there was a paucity of evidence establishing the crew members' knowledge of the cocaine. See Caro-Quintero, 769 F.Supp. at 1574. This bit of extraneous evidence may well have tilted the balance against the defendants. Defendants are therefore entitled to a new trial.
 
 
 136
 B. Prosecutorial Misconduct.
 
 
 137
 The DEA chief's statements to the press also constitute prosecutorial misconduct. This Court has recognized that "[w]hile we use the term 'prosecutorial' misconduct, this label encompasses actions of government agents for which the 'prosecution' must account." United States v. de Cruz, 82 F.3d 856, 868 (9th Cir.1996) (finding prosecutorial misconduct for actions of INS special agent). The DEA agent was a high ranking official involved in the investigation of this case. The prosecution can rightfully be held accountable for his actions.
 
 
 138
 The district court's error undermines one of the most fundamental tenets of our justice system: that a defendant's conviction be based only on evidence presented at trial. The error is arguably one that is so fundamental and so defies meaningful review that automatic reversal is required. See United States v. Noushfar, 78 F.3d 1442 (9th Cir.1996), as amended by 140 F.3d 1244 (9th Cir.1998).
 
 
 139
 Moreover, although we generally presume that jurors obey the district court's instructions to ignore improper remarks, the jurors in this case did not. Therefore, the government's error was not ameliorated by the district court's curative instruction and the crew members were prejudiced by the statements. A mistrial should be granted.
 
 
 
 [1]
 Congress recently amended section 1903 to provide that United States jurisdiction over vessels is no longer an element of the offense, but is a question of law for the trial court. 46 U.S.C. app. § 1903(f) (effective October 19, 1996)
 
 
 [2]
 The appellants also argue that the trial court should not have asked the jurors if the article affected their deliberations, because Federal Rule of Evidence 606(b) precludes the court from questioning jurors about the deliberative process. Bagnariol, 665 F.2d at 884-85. Because the court did not base its decision on this information, any error is harmless
 
 
 [3]
 Notwithstanding these facts, the Coast Guard log for the first day of the inspection reported that the fishing gear was operable
 
 
 [4]
 Although the appellants argue the hurricane through which the Nataly I was towed explains the small number of knives and their rusty condition, this was a matter for the jury to consider in weighing the evidence